**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ROLAND STEELE, | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 09-626 |
| JEFFREY BEARD, Commissioner, | ) | |
| Pennsylvania Department of Corrections, | ) | Judge Arthur J. Schwab |
| et al., | ) | |
| Respondents. | ) | |

**O P I N I O N**

## I.    Introduction

In June of 1985, Roland Steele was charged with murdering Lucille Horner, age 88, Minnie Warrick, age 86, and Sarah Kuntz, age 85.  The following year, in the Court of Common Pleas of Washington County, a jury convicted him of three counts of first-degree murder, two counts of robbery, and two counts of theft by unlawful taking.  Following a penalty hearing, the jury sentenced him to death on each murder conviction.

Before this Court is Steele's petition for a writ of habeas corpus, which he has filed pursuant to 28 U.S.C. § 2254.  He raises 15 claims and numerous subclaims.  He contends that he is entitled to a new trial or, at a minimum, a new sentencing hearing.  After careful consideration, I conclude that Steele is not entitled to relief on any of the claims in which he challenges his convictions.  Therefore, I will deny his request for a new trial.

I must, however, grant him a conditional writ of habeas corpus with respect to his request for a new sentencing hearing because the U.S. Court of Appeals for the Third Circuit has held that the jury instructions and verdict form employed in Steele's sentencing hearing violated the Eighth Amendment, pursuant to Mills v. Maryland, 486 U.S. 367 (1988).  Under the terms of the

writ, the Commonwealth may conduct a new sentencing hearing, at which a jury will once again decide whether Steele should be sentenced to death or to life imprisonment without the possibility of parole.  If the Commonwealth does not conduct a new hearing, it must resentence Steele to a term of life imprisonment without the possibility of parole.

My disposition of the <u>Mills</u> claim and the conclusion that a writ of habeas corpus is issued with respect to Steele's capital sentence renders it unnecessary to address his remaining sentencing-phase claims; any relief he could obtain on those claims would be cumulative.

Steele's guilt-phase claims and his sentencing-phase <u>Mills</u> claim are:

Claim 3      He was denied a fair trial and due process when the Commonwealth
             introduced the false and unreliable testimony of F.B.I. Special Agent Andrew
             Podolak, who stated that hair samples taken from Steele's clothing were Minnie
             Warrick's hairs

Claim 4      His counsel was rendered ineffective due to the Commonwealth's discovery
             violations regarding Agent Podolak's testimony; and, were ineffective for failing
             to protect him from those discovery violations, for failing to adequately cross-
             examine, impeach, and rebut Agent Podolak's testimony, and, for failing to retain
             a defense expert to conduct hair comparison analysis

Claim 5      He was denied due process, an impartial jury, reliable sentencing and
             the effective assistance of counsel because venire members were not
             subjected to adequate *voir dire* during jury selection regarding racial bias

Claim 6      He was denied due process, a meaningful appeal and post-conviction
             hearing, and the effective assistance of counsel because he did not
             receive a complete set of *voir dire* transcripts

Claim 7      He was denied due process and the effective assistance of counsel
             because the trial court failed to provide specific instructions
             regarding the identification testimony provided by Harry Crothers and on cross-
             racial identification, and counsel failed to object and offer specific points of
             charge

Claim 8      He was denied due process, a unanimous verdict, and the effective
             assistance of counsel because the trial court's guilt-phase unanimity instruction
             improperly coerced a verdict and counsel failed to object to the erroneous
             instruction

Claim 9          He was denied due process and the effective assistance of counsel
                 because the prosecutor engaged in prejudicial misconduct during closing
                 arguments at the guilt phase of the trial without objection by counsel

Claim 10         He was denied due process and reliable sentencing because the trial
                 court erroneously instructed the jury that it had to unanimously find a
                 mitigating circumstance before giving it effect, in violation of
                 Mills v. Maryland, 486 U.S. 367 (1988)

Claim 13         He was denied due process and an impartial jury because the jury
                 deliberations were infected with racial bias, predisposed opinions regarding
                 his guilt, and external influence, and because the jury engaged in
                 deliberative discussions before hearing the evidence

Claim 14         Counsel were ineffective for failing to raise all of the claims alleged in the
                 habeas petition

Claim 15         He was denied due process and the effective assistance of counsel as a result of
                 the prejudicial effects of the cumulative errors in this case, which undermine
                 confidence in the outcome of his trial


## II.    Facts and Procedural History

On June 22, 1985, shortly after 6:00 a.m., the badly beaten body of Lucille Horner was

discovered amidst discarded tires and other debris in a secluded wooded location just off Papp

Road in Cecil Township, Washington County.  While processing the crime scene, a police

officer discovered the bodies of Sarah Kuntz and Minnie Warrick under a pile of discarded tires

in the same general area where Horner's body was located.  Steele had lived near the site when

he was a youth and he was familiar with the area.  Trial Tr. at 553-55, 1115-20, 1198-99.

The police quickly learned that the day before, on June 21, 1985, the victims had attended

together a charitable luncheon at the Club Internationale, which is located in the Millcraft Center

in the City of Washington, Pennsylvania.  Lucille Horner drove them to the luncheon in her car,

which was a beige-colored 1974 Dodge Dart.  The luncheon began around 1:00 p.m. and ended

3

around 2:30 p.m.  As discussed below, the women were last seen alive with Steele, who was observed driving them, in Lucille Horner's car, out of the Millcraft Center parking lot.

Dr. Earnest L. Abernathy, Chief Pathologist of Washington Hospital, performed the autopsies.  His conclusions, coupled with the knowledge of when they were last seen alive, placed the victims' deaths at some time after 2:30 p.m. on June 21, 1985.  Id. at 189-90. Dr. Abernathy testified at Steele's subsequent trial that Lucille Horner's injuries included significant bruising on her chin, chest, and back, damage to her heart, numerous fractures of her ribs, a fracture of her backbone, damage to her liver, and a torn larynx.  He concluded that the cause of death was traumatic rupture of the heart.  The autopsy of Sarah Kuntz revealed similar injuries, including bruises on her face, chest, and legs, lacerations to the scalp, fractured ribs, and damage to her heart and liver.  Dr. Abernathy concluded that the cause of death was asphyxia due to a fracture of the larynx.  With regard to Minnie Warrick, Dr. Abernathy testified that she also sustained bruising to the face and chest, fractured ribs, and heart damage, as well as a partially collapsed lung and blowout of the stomach wall.  The cause of death for Warrick was traumatic rupture of the heart, with numerous companion injuries.

Dr. Abernathy testified that the pattern of bruising on the victims was similar in all three cases, and was caused by substantial blunt force blows, which, in his opinion, were most likely delivered by human hands.  The defense stipulated that Steele knew martial arts, and Commonwealth witnesses testified that he was a black belt in karate and had been employed as a martial arts instructor.  Id. at 629-31, 637-38.

On June 23, 1985, the day after the victims' bodies were discovered, the police arrested Steele and charged him with their murders and with robbing them.  Public Defender John Liekar, Sr., Esquire, and Assistant Public Defender Paul Tershel, Esquire, represented him.  Tershel was

lead trial counsel. A jury was selected from a venire in Erie County, and Steele's nine-day trial commenced on January 10, 1986. John C. Pettit, the District Attorney of Washington County, was the prosecutor.

At the trial, Steele did not dispute that he was in the vicinity of the Millcraft Center as late as 12:00 p.m. on the day the victims were murdered. Id. at 1201-02. See also id. at 754-57. Both Steele and William F. Henkel, Esquire, an attorney who was representing him in a civil lawsuit, testified that Steele visited Henkel at his office at approximately 11:15 a.m. on that date, and that Steele left there between around 11:45 a.m. and noon. Id. at 749-52, 1201. Henkel's office was located approximately three blocks from the Millcraft Center. Id. at 754-57.

Steele testified that he traveled to the City of Pittsburgh shortly after he left Henkel's office around noon and did not return to Washington County that day. The Commonwealth presented witnesses that countered Steele's testimony and placed him with the victims at the Millcraft Center after they had left their charity luncheon at around 2:30 p.m. It also introduced evidence to demonstrate that, as late as around 4:30 p.m., Steele was driving Lucille Horner's Dodge Dart in Washington County near where the victims were murdered.

Robert Poland knew Steele. He testified that he saw Steele the day of the murders at around 1:30 p.m. about 10 to 15 blocks from the Millcraft Center. Id. at 226. By the time the victims were leaving their charity luncheon around at 2:30 p.m., the Commonwealth's witnesses placed Steele at the Millcraft Center. Mildred Stitler lived in the Bassettown Manor Apartments, which is located next to the shopping center. From the windows of her fourth floor apartment, she could see into the shopping center's parking lot. She was looking out those windows on June 21, 1985 and saw Steele "wandering" around the parking lot. Id. at 245-46, 252. Stitler testified that she saw Steele approach Lucille Horner, who was sitting in the driver's seat of her car.

5

Stitler observed Steele talking to Horner and motioning to her in a manner that Stitler interpreted as "trying to show [Horner] that there was something wrong with [one of her car's tires]." Id. at 246. Stitler stated that she saw Horner exit the driver's seat and get into the front passenger's seat. Steele got behind the wheel of Horner's car and he drove over to where Minnie Warrick and Sarah Kuntz were standing. They got into the car and Steele drove the three victims out of the parking lot. Id. at 247-48.

Kimberly Oyler testified that she was in the Millcraft Center's parking lot on the day of the murders at around 2:30 p.m. Her doctor's office was located nearby and she had parked there and was walking towards the office. Id. at 258. As she was doing so, she saw Sarah Kuntz getting into Lucille Horner's car. She testified that Steele was holding open one of the car's back doors for Kuntz. Steele was between "ten and twelve feet" from Oyler and she testified that she had the opportunity to get a good look at him. Id. at 261-62.

Harry Crothers is a locksmith who owned a shop across the street from the Millcraft Center. Id. at 274. On the day of the murders, he was returning to his shop around the same time that Stitler and Oyler had witnessed the events in question. Crothers testified that he saw a vehicle pull out in front of him from the alley behind the shopping center. Id. at 275. He knew Lucille Horner because she went to his church and was the mother-in-law of an acquaintance of his. He testified that "[t]he vehicle went to the stoplight, kind of undecided as to whether it was going to go straight ahead or make a left or right-hand turn and it straddled the two lanes of traffic. That's what called it to my attention because I was late in going from one job to another and being indecisive they didn't seem to know which way they were going." Id. at 275-76. Crothers testified that Steele was driving the car and Lucille Horner was in the front passenger's seat. He also observed two elderly women sitting in the backseat of the car. Crothers sat behind

the car at a traffic light. He testified that he was able to see Steele's face and that there was no question in his mind that Steele was the man he saw driving the car. Id. at 276-78.

Stitler, Crothers, and Oyler were the last people to see the victims alive. The victims left the Millcraft Center with Steele, who was driving them in Lucille Horner's Dodge Dart. Several people would see Steele later that afternoon driving that same car, but Minnie Warrick, Sarah Kuntz, and Lucille Horner were not seen again until their bodies were found the next day.

At the time of the murders, Steele was living with his girlfriend, Joan Whitlock, at her home in McKees Rocks, a borough of Allegheny County, Pennsylvania. Her brother, Duane Jordan, testified that Steele visited him at night on the date of the murders. Jordan lived on Old Orchard Circle, which is in the Broadhead Manor housing project. Id. at 545-47. A few days after Steele had visited him, on or around June 25, 1985, a maintenance worker with the housing authority found a discarded white vinyl purse near Jordan's home. Id. at 536-37. Inside that purse where items that belonged to the victims, including several of their credit and insurance cards. Id. at 539-40.

On the same day of the murders, the home of Dehla Woznicak was robbed. She lived near Hendersonville, which is less than two miles from where the victims' bodies were found. The robbery occurred sometime between around 3:30 p.m. and 4:50 p.m., during which time Woznicak was out of her house visiting her daughter-in-law. Id. at 395-97. Woznicak returned to a home that had been ransacked and was missing several household items, including lamps, bowls, a scales of justice decorative statue, and a Hitachi television set. Id. at 398-406. The intruder had emptied drawers of clothing onto Woznicak's bed, and when Woznicak was cleaning up she found an item of clothing that did not belong to her. The item was later

7

identified as being the bottom portion of the purple dress that Minnie Warrick had been wearing that day.  Id. at 407, 416.

Thus, the police soon realized that there was a connection between the Woznicak robbery and the crimes that had been committed against the victims.  After Steele was arrested and the police searched his girlfriend Joan Whitlock's home, they found the Woznicak's stolen property there.  Steele admitted that it was he who had brought the stolen items into Whitlock's home, and several of Whitlock's neighbors had seen him unloading the items from a car that matched the description of Lucille Horner's Dodge Dart.

Klements Service Station is located about 3/10ths of a mile from the Woznicak residence and about 1 ½ miles from the scene of the murders.  Id. at 462.  Through the testimony of its owner, Joseph Klements, his son Victor, and his wife Janice, the Commonwealth presented evidence to demonstrate that Steele visited the service station twice in the afternoon on the date of the murders.  Steele first came to the station between around 3:00-3:30 p.m.  He was there for approximately five to ten minutes.  The second time he was there was between around 4:00-4:30 p.m.  Id. at 283-90, 353-55, 364.  Both times he came to the station, Steele was driving Lucille Horner's beige Dodge Dart.  Id. at 287, 355-58.

Victor Klements had two good opportunities to view and speak with Steele.  The first time Steele was at the station, he purchased two cans of soda and Victor waited on him.  Steele told him he used to live in the area.  Id. at 354.  The second time Steele was there, he was having mechanical problems with the Dodge Dart and he coasted into the station.  Victor Klements got into the car and was able to get it running in about two minutes.  Steele thanked him and got back into the car and drove away.  Id. at 355-57.

Willie Scarfanski, age 11, and Mark Hall, age 13, were at Klements Service Station the first time Steele was there. They both testified that Steele was the man they saw come into the service station that afternoon. Id. at 305, 347. Scarfanski stated that he saw Steele buy the two cans of soda. Then, as Steele was about to leave the station, he turned to Scarfanski, took a gold necklace from his pocket, and asked Scarfanski if he wanted it. Scarfanski said yes and Steele gave it to him. Id. at 306. Hall testified that after Steele left, Scarfanski showed him the necklace and told him that Steele had given it to him. Id. at 348-49.

Scarfanski gave the necklace to the police and it was entered as an exhibit at Steele's trial. Joan Lutz is Minnie Warrick's daughter. She testified that the necklace belonged to her mother. Minnie Warrick had originally given it to her as a Christmas gift. Lutz stated that it sat on her dresser for a year and she looked at every day. Because she did not wear it, she gave it back to her mother. Lutz was sure that the necklace that Steele had given to Scarfanski was her mother's necklace. Id. at 373-78. Gaye Warrick testified that she saw her mother-in-law, Minnie Warrick, about once a week and that she always wore the gold necklace. She also testified that she was sure that the necklace that Steele had given to Scarfanski was the one that Minnie Warrick always wore. Id. at 383-85.

When Steele was arrested on June 23, 1985, the police searched his girlfriend Joan Whitlock's home and found the items that had been stolen from the Woznicak's residence. Whitlock told the police that Steele brought the items to her home. Id. at 441-50. Jacob Frazier, Whitlock's neighbor, testified that in the evening of June 21, 1985, he saw Steele in Whitlock's driveway taking items out of a beige-colored Dodge. Frazier stated that the items matched the description of the household items that had been stolen earlier that day from the Woznicak residence. Id. at 482-87. Cathyrn Slusser and Cynthia Williams also lived near Whitlock. They

testified that they observed Steele at around 5:30 p.m. on the date of the murders as he was taking the stolen items into Whitlock's home.  Id. at 490-95, 499-02.  Slusser positively identified Lucille Horner's beige Dodge Dart as the car that Steele was using.  Id. at 494.  Another neighbor, Anna Frazier, testified that she saw Steele the next day and was driving "a cream-colored Dodge Dart."  Id. at 506-07.

The Commonwealth introduced testimony to demonstrate that the victims unfortunately had fallen victim to a tactic that Steele had tried unsuccessfully on at least one, and possibly two, other women that week.  Sarah Hair testified that on June 18, 1985 (three days before the victims were murdered) she had gone grocery shopping in the Bridgeville area.  Around 6:15 p.m., after she had placed her groceries into her car and had gotten into the driver's seat, Steele approached her and told her that she had a flat tire.  Hair got out of her car in order to look at her right rear tire.  She told Steele that the tire did not look flat to her, but Steele insisted that it was, and told her that someone had "been fooling with" it and had put a nail in it.  For several minutes Hair, who initially thought Steele was trying to help her, stood outside her car and discussed the matter with him as he tried to show her that there was a nail in her tire.  When Steele finally told her that he could not dislodge the nail and that he should go with her to a service station, Hair became suspicious.  She got back into her car with the intent to leave.  Before she could go, Steele asked her to take another look at her tire because he wanted to "show her something." When she did, there was a pair of sharp pointed scissors under her rear wheel, which had not been there before.  Hair realized that Steele had just placed the scissors there and that she needed to get away from him.  She immediately got into her car and drove straight to the police station to report the incident.  Id. at 704-14.

After Steele testified and denied that he had ever approached Hair or had been in the Bridgeville area on June 18, 1985, the trial court permitted the Commonwealth to call Rosalyn Fields as a rebuttal witness. She testified that on June 18, 1985, she was at the Great Southern Shopping Center, which also is located in Bridgeville. Fields stated that at around 7:50 p.m., Steele approached her when she was in her car. Although the trial court would not permit Fields to discuss the substance of their conversation, Fields did testify that she was so disturbed by the incident that she immediately went into a store and reported it to the management, who then called the police. Id. at 1377-81.

Finally, as will be detailed below in the discussion of Claims 3 and 4, the Commonwealth introduced expert testimony from F.B.I. Special Agent Andrew Podolak. He testified that he examined hairs found on two items of Steele's clothing, which the police had obtained when they searched Whitlock's home. Podolak conducted microscopic comparisons between those samples and samples taken from Minnie Warrick. He stated that in his opinion the hairs found on Steele's clothing were Minnie Warrick's. Id. at 583.

Although Steele now is highly critical of his counsel's performance, Tershel did attempt on cross-examination of the Commonwealth's witnesses to point out inconsistencies between their trial testimony and earlier statements that they had made, either to the police or at prior court proceedings. He also called as a defense witness Jean Jones, a neighbor of Dehla Woznicak. She testified that when she went outside to get her mail on June 21, 1985, she spoke briefly with a man who was outside of the Woznicak home. He was driving a car that looked

like Lucille Horner's car. Jones stated that this individual had a full head of hair and was not Steele, who was bald.[1] Id. at 731-44.

Tershel presented the testimony of Dr. Paul M. Bernstein as an expert in eye-witness identification. Dr. Bernstein discussed research that demonstrated the fallibility of eye-witness identification. Id. at 1018-21, 1027-30. He testified that studies have shown that "white people identify white people" twenty percent better "than they identify black people." Id. at 1031.

Tershel also called as a defense expert forensic pathologist Dr. Cyril Wecht, who challenged Dr. Abernathy's certainty that the deadly blows to the victims had been inflicted by bare hands. Dr. Wecht testified that it was not possible to precisely identify the mechanism or instrumentality that produced the victims' injuries. Id. at 867. He also disputed Agent Podolak's testimony by explaining that hair comparison testing cannot yield the definitive conclusions such as that offered by Podolak. Id. at 858-60.

To further counter the Commonwealth's theory that Steele killed the victims using his marital arts skills, Tershel introduced testimony from a police investigator who stated that Steele had no marks on his hands when he was arrested two days after the murders. Id. at 920. Tershel also called a martial arts instructor, who testified that Steele's hands would have been bruised if he had committed the murders by striking blows with them. Id. at 925-30.

Steele chose to testify, thereby placing his own credibility before the jury. He denied murdering and robbing the victims. He then gave an explanation as to his whereabouts the day of the murders that likely did his defense no favors.

---

[1] Steele admitted during his testimony that he had worn wigs in the past. Tershel did get Jones to acknowledge that she did not think that the man she had spoken with was Steele wearing a wig. Tershel also successfully blocked the Commonwealth from introducing testimony from a police officer who would have testified that Steele was wearing a wig when he was arrested during a robbery in 1982. See Trial Tr. at 1363-69.

Steele testified that after he left Attorney Henkle's office around noon on the day of the murders, he began walking toward the transit terminal so that he could catch a bus to Pittsburgh. As he was walking down the street, a man driving an Oldsmobile or Buick stopped him and called him over to his car. Steele did not know the man. He went by the nickname "PI," and he never told Steele his real name. Id. at 1202-03.

According to Steele, PI drove him to Pittsburgh, and they arrived there around 12:45 p.m. They agreed to meet again at around 5:00 p.m. in downtown Pittsburgh at a bar called The Purgatory. Steele said that after he left PI, he walked around downtown. At some point in the afternoon, he met a man named Larry Wallace at the bus station (which was near The Purgatory) for about 30 minutes. After their meeting, he went to The Purgatory. PI eventually met him there. PI then took him to another location in town and showed him some cars. Id. at 1204-10.

Steele testified that PI gave him a light yellowish-colored car,[2] and said that he could have it for a few days to see if he wanted to buy it. He and PI then drove to a bar located in the Hill District area of Pittsburgh. Steele stayed in the car and PI went inside. When PI came out, he was with a man who took Steele over to a black van. Inside the van were several items, including the items that had been stolen from the Woznicak house earlier that day. Steele stated that he bought all of the items for $50, and that, he explained, was how he came into possession of the Woznicak's stolen property. Around 6:00 p.m., Steele drove the car that PI had given to him to Whitlock's house, and he took the stolen items inside. That, he explained, is why

---

[2]     Steele testified that the color of the car was a lighter shade of yellow, similar to that of a specific envelope that was in the courtroom. When the prosecutor tried to get him to admit that the envelope to which Steele was referring was obviously beige or cream-colored, similar to the color of Lucille Horner's car, Steele refused to do so. Trial Tr. at 1239-41.

Whitlock's neighbors saw him unloading the stolen items from a cream-colored car.  Id. at 1207-15, 1239-46.

Steele did not present a single witness to corroborate his testimony.  During cross-examination, he said that he had never been: at the Millcraft Center parking lot (which was where Stitler and Oyler said that they had seen him with the victims, and which was nearby where Crothers said that he had seen him with them); at the Woznicak house (even though the witnesses at Klements Service Station said that they had seen him in the area around the time the Woznicak home was robbed); at the Chartiers Valley Shopping Center (where Sarah Hair said he had approached her); at the Great Southern Shopping Center (where Rosalyn Fields said he had approached her); or, at Klements Service Station (where Joseph, Victor, and Janice Klements, and Willie Scarfanski and Mark Hall said that they had seen him).  Id. at 1263-64, 1269.  Steele could provide no explanation as to how the victims' credit and insurance cards had ended up outside the house in Broadhead Manor that he had visited the night of June 21, 1985.  Id. at 1282-83, 1309.

On January 21, 1986, the jury convicted Steele of three counts of first-degree murder, two counts of robbery, and two counts of theft by unlawful taking.  Following a separate penalty hearing that was conducted the next day, the jury fixed the punishment at death for each murder conviction.

Steele, through Liekar, filed post-trial motions, which the trial court denied in a 72-page Opinion issued on March 3, 1988.  Commonwealth v. Steele, Nos. 686, 687 & 688 of 1985, slip op. (C.P. Wash. Mar. 3, 1988) ("Post-Trial Op.").  On June 5, 1989, the Pennsylvania Supreme Court affirmed.  Commonwealth v. Steele, 559 A.2d 904 (Pa. 1989) ("Steele I").

In 1996, Steele filed in state court a *pro se* petition for collateral relief pursuant to Pennsylvania's Post-Conviction Relief Act ("PCRA"). The court appointed him new counsel and on January 11, 2000, an Amended PCRA Petition was filed. Steele raised numerous claims for relief, including the claims that he now raises before this Court. He also filed exhibits and declarations to support the allegations made in the Amended PCRA Petition. See Petitioner's Exhibits and Affidavits, submitted to the PCRA Court on Jan. 24, 2001.

On May 30, 2000, the PCRA Court held an evidentiary hearing during which it permitted the introduction of testimony from two witnesses: Attorney Tershel and Michael Reid, who was the defense investigator for Steele's trial.[3] Steele's counsel sought to introduce the testimony of additional witnesses but the PCRA Court denied their request.

On September 26, 2001, the PCRA Court issued a decision in which it denied the Amended PCRA Petition. Commonwealth v. Steele, Nos. 686, 687, and 688 of 1985, slip op. (C.P. Wash. Sept. 26, 2001) ("PCRA Court Op."). The Pennsylvania Supreme Court affirmed on December 18, 2008. Commonwealth v. Steele, 961 A.2d 786 (Pa. 2008) ("Steele II"). It denied reargument on March 6, 2009.

On October 29, 2009, Steele filed with this Court a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.[4] [ECF No. 11]. I granted his unopposed motion for discovery. [ECF Nos. 17, 18]. After the completion of discovery, Steele filed a 192-page Memorandum of Law In Support Of Petition For Writ Of Habeas Corpus [ECF No. 22]. An evidentiary hearing

---

[3] Attorney Liekar died in 1999.

[4] This case was stayed soon after Steele had commenced it because he was litigating in state court a second PCRA petition in which he contended that he was mentally retarded and his death sentence is unconstitutional pursuant to Atkins v. Virginia, 536 U.S. 304 (2002). Steele subsequently withdrew his second PCRA petition and this case was reactivated.

was held on January 13, 2011, after which Steele filed supplemental memoranda [ECF Nos. 47-49].  The Commonwealth has filed its Answer [ECF Nos. 25, 49] and Steele has filed a Reply [ECF No. 50].

### III.    Standard Of Review

Steele's petition is governed by the federal habeas statute applicable to state prisoners, 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, 110 Stat. 1214, April 24, 1996 ("AEDPA").  Under this statute, habeas relief is only available on the grounds that Steele's convictions or sentences of death were obtained in violation of his federal constitutional rights.  28 U.S.C. § 2254(a).  Errors of state law are not cognizable.  See, e.g., Priester v. Vaughn, 382 F.3d 394, 402 (3d Cir. 2004) ("Federal courts reviewing habeas claims cannot 'reexamine state court determinations on state-law questions.'") (quoting Estelle v. McGuire, 502 U.S. 62, 67-68 (1991)).  See also Real v. Shannon, 600 F.3d 302, 309-10 (3d Cir. 2010).

In describing the role of federal habeas proceedings, the U.S. Supreme Court, in Barefoot v. Estelle, 463 U.S. 880, 887 (1983), noted:

> [I]t must be remembered that direct appeal is the primary avenue for review of a conviction or sentence.... The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited. Federal courts are not forums in which to relitigate state trials.

Several years after the Court made this observation, Congress enacted AEDPA, which "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  Bell v. Cone, 535 U.S. 685, 693 (2002).  It "requires federal courts

collaterally reviewing state proceedings to afford considerable deference to state courts' legal and

factual determinations." Lambert v. Blackwell, 387 F.3d 210, 234 (3d Cir. 2004).

As codified at 28 U.S.C. § 2254(d), AEDPA provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was *adjudicated on the merits in State court proceedings* unless the adjudication of the claim–
>
> (1) resulted in a decision that was *contrary to,*[5] *or involved an unreasonable application of,*[6] *clearly established Federal law, as determined by the Supreme Court of the United States*; or
>
> (2) resulted in a decision that was based on an *unreasonable determination of the facts in light of the evidence presented in the State court proceeding*.

(Emphasis added).

Thus, AEDPA circumscribes a federal court's review of a state prisoner's federal

constitutional claim when the state court has adjudicated that claim on the merits. Importantly,

review under § 2254(d) is limited to the record that was before the state court. Cullen v.

Pinholster, — U.S. —, 131 S.Ct. 1388, 1398-1401 (2011). See also Roundtree v. Balicki, 640

F.3d 530, 538 (3d Cir. 2011).

---

[5]  "A state-court decision is 'contrary to' clearly established federal law if the state court (1) 'contradicts the governing law set forth in [the Supreme] Court's cases' or (2) 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a [different] result.'" Lambert, 387 F.3d at 234 (quoting Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).

[6]  "A state-court decision 'involve[s] an unreasonable application' of clearly established federal law if the state court (1) 'identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case'; or (2) 'unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'" Lambert, 387 F.3d at 234 (quoting Williams, 529 U.S. at 407).

"[F]or the purposes of [§] 2254(d), a claim has been 'adjudicated on the merits in State court proceedings' when a state court has made a decision that finally resolves the claim based on its substance, not on a procedural, or other, ground."  Thomas v. Horn, 570 F.3d 105, 117 (3d Cir. 2009).  When the state court has not adjudicated a claim on the merits, AEDPA's standard of review at § 2254(d) does not apply and the federal habeas court's review is *de novo*.  Id. at 124.[7]

Steele contends that, although he presented Claims 3, 6, 7, 8, 9, 10, and 14 to the Pennsylvania Supreme Court, that court did not adjudicate them on the merits and therefore AEDPA's standard of review at § 2254(d) does not apply to my review of those claims.  Because the Commonwealth does not challenge Steele's contention in this regard, I will review all of those claims *de novo*.[8]  Steele acknowledges that the Pennsylvania Supreme Court adjudicated on the merits Claims 4,[9] 5, 13, and 15 and therefore my review of each of those claims is governed by AEDPA's deferential standard of review at § 2254(d).

---

[7]     Regardless of whether a state court has adjudicated a claim on the merits so as to invoke review under the standard set forth in § 2254(d), a federal habeas court must presume that all state-court *factual findings* are correct unless the presumption is rebutted by clear and convincing evidence.  See Palmer v. Hendricks, 592 F.3d 386, 392 (3d Cir. 2010) (citing 28 U.S.C. § 2254(e)(1)).

[8]     Steele presents lengthy arguments to support his position that none of the claims that the Pennsylvania Supreme Court refused to consider on the merits are procedurally defaulted.  [ECF No. 22, Memorandum Of Law In Support Of Petition, at 1-4, 78-79, 88-90, 116, 124-25, 130, 140-41, 150-51, 174-75].  The Commonwealth does not challenge his arguments and does not contend that any of the claims at issue are procedurally defaulted.

[9]     Steele asserts that the Pennsylvania Supreme Court did not adjudicate on the merits the subpart of Claim 4 in which he argued that the Commonwealth's alleged discovery violations "rendered" his trial counsel ineffective.  I cannot accept this assertion.  As discussed below, the Pennsylvania Supreme Court denied that subpart on the merits.  Steele II, 961 A.2d at 800.  See also id. at 801 (rejecting argument that Steele's trial counsel were ineffective for failing to sufficiently rebut Agent Podolak's trial testimony or obtain a defense expert to conduct hair comparison testing).

## IV.    Guilt-Phase Claims

### A.    Agent Podolak's Testimony (Claims 3 & 4)

#### (1)    Background

Prior to the trial, the Commonwealth disclosed to the defense a report that had been prepared by the F.B.I. and that contained the results of Agent Podolak's analysis.  In relevant part, it was explained in the report that hair samples had been taken from two items of clothing that belonged to Steele, which the police had obtained when they searched his girlfriend Joan Whitlock's home.  The items of clothing received the F.B.I. Lab designations of Q117 (a suit coat) and Q121 (pants).  The hairs recovered from Q117 and Q121 were compared against control sample hairs from Minnie Warrick, which were designated as K9.  Agent Podolak stated the following in the report:

> Brown head hairs of Caucasian origin were found on Q117 and Q121. These hairs exhibit the same microscopic characteristics as the hairs found in K9 and, according, *are consistent with* having originated from MINNIE H. WARRICK.
>
> *It is noted that hair comparisons do not constitute a basis for absolute personal identification.*

Ex. 6 of Petitioner's Exhibits and Affidavits, submitted to the PCRA Court on Jan. 24, 2001 (emphasis added).

The defense filed a motion *in limine*, in which it requested that the Commonwealth be precluded from introducing Agent Podolak's testimony because it was inconclusive.  Defense Motion In Limine, ¶ 3.  The court presided over argument on the motion in chambers on January 10, 1986, just prior to the commencement of the trial.  The prosecutor indicated, apparently for

the first time, that if Agent Podolak testified, the opinion he would give would be more definitive

than the one contained in the report:

> **Pettit:** [Agent Podolak has] made comparisons and in his statement to me, in preparing for this, he has indicated that if perhaps, there were two hundred people in the courtroom and he were to take a hair from each one of those individuals, he could say which hair came from each of the two hundred people. He said that just by the naked eye, if you are to be in a group of people and look at each person's hair without the benefit of a microscope, from years of training and expertise, you can, by just looking at each person in a group, in and of yourself, make certain distinguishments from it and so it's our opinion that it becomes a question of credibility of this witness.
>
> **Court:** Let me ask you, he said that he can … Is there anyone that can take a hair and match it with a hair from a known person? Is there any expert that can say that is definitely that person's hair … [I]s it like fingerprints where if you say you get eight or nine characteristics on a fingerprint, then you can say that that is the fingerprint and in all probability of "X" or how is it? Is his testimony any more definite than anyones [sic] could be?
> - - -
> … [I]f the answer is no, there are no experts who can come in and say definitely that the separated hair that is found comparing with a known hair, they cannot say with any definiteness that that is the hair, correct?
>
> **Liekar:** Yes.
>
> **Court:** And in this case, this expert so says?
>
> **Pettit:** He so says, yes.
>
> **Court:** Okay … I'm going to deny [the motion *in limine*]. It certainly is relevant and it will be a matter of what weight the jury would want to give it.
>
> **Tershel:** On that same line, I would interject, if the expert cannot say much more than anyone can say, with a naked eye, then I think he's delving into the jury's fact finding process and I don't think it's proper expert testimony, as an expert witness saying that he in fact says that the characteristics are the same and that is going to be

> giving more weight than someone else and I think that it is also a
> reason to keep this out.

**Court:**    I understand what you are saying. You're saying that the naked
eye, but this guy took it one step further and did make microscopic
examinations and found certain characteristics. Is it like
fingerprints? We know in fingerprints, that for the testimony to be
admissible there has to be a minimum standard; seven, eight or
nine characteristics….

**Pettit:**    Your Honor, there is a scientific approach that he uses and I am not
at this point, and he will testify to the approach that he does use. I
don't have all of that ready. He's been in Alaska for the last week
and we had to get him back from going to Guam to be available.

**Court:**    Well, I made my ruling and the defense can cross examine on
those matters and that will be up for the jury to determine and of
course, you may argue those factors.

Trial Tr. at 4-9.

A day or so before Agent Podolak testified, the matter came up again:

**Tershel:**    As Mr. Pettit said, as far as hair analysis, it says inconclusive here
[in the report], but [Agent Podolak is] going to be able to say and
[Mr. Pettit] told us at the pre-trial that out of 200 people you could
pick the one in the courtroom who has that hair.

- - -

**Court:**    This business about hair and about a hundred people who may
have the same hair, was that given in the report or was that given
in conversation?

**Pettit:**    That was given in conversation over the telephone in my trying to
educate myself as to the manner of testimony.

Id. at 331-32.

The Commonwealth called Agent Podolak to testify on January 15, 1986. He testified

that he had been employed by the F.B.I. for nine years, that he has a Masters of Science degree

in microbiology, and that the nature of his work is to examine, identify, and compare hairs and

textile fibers. Id. at 564-65. He provided a lengthy explanation regarding what characteristics he

21

looks for in hairs in conducting his comparisons.  Id. at 569-73.  He explained:  "It's the association of all these characteristics in association with one another that gives a uniqueness to the hair and allows me to make an association to a particular individual."  Id. at 573.

Agent Podolak stated that he compared the hairs taken from Q117 and Q121 with control samples from the victims.  The prosecutor asked him if the hairs found on Steele's clothing came from one of the victims.  Tershel immediately objected, arguing that because Podolak in his report had stated that hair comparisons do not constitute a basis for absolute personal identification, he could not state definitively that the recovered hairs matched any of the victims. At most, Tershel asserted, Podolak could only opine that the recovered hairs "were consistent with" hairs from a victim.  Id. at 578-82.  The trial court overruled this objection and instructed: "On cross examination, you can bring that out but he's certainly qualified to testify as to comparisons and he went through the whole routine of the methodology he uses to do that and we have heard that."  Id. at 582.

Agent Podolak then answered the prosecutor's question as follows:

> **Podolak:**    I found brown, Caucasian head hairs on two items of clothing, the sportscoat [Q117] and a pair of slacks [Q121] that were reported to me as belonging to Mr. Steele.  Now, these hairs matched in every observable microscopic characteristic to that known hair sample of Minnie Warrick and consistent with having originated from her.  In my opinion, based on my experience in the laboratory and having done 16,000 hair examinations, my opinion is that those hairs came from Minnie Warrick.

Id. at 583.

It was undisputed that Steele *had not been wearing Q117 and Q121 during any of the events in question*.  Id. at 605-07.  This required Agent Podolak to explain that those items of clothing may have been placed near the clothes that Steele had been wearing when he committed

the crimes, and that is how the hair samples in question had been deposited on Q117 and Q121. <u>Id.</u> at 609-10.

On cross-examination, Agent Podolak admitted that he could not tell the sex or the age of the person whose hairs were found on Q117 and Q121, and that no follicular tissue samples were supplied for analysis, which would have aided the comparison testing. <u>Id.</u> at 583A, 584. He also acknowledged that he made his determination by putting the hair samples under a microscope and looking with his naked eye, and that there is no mathematical way to determine whether there is a match. <u>Id.</u> at 585.

Tershel inquired into whether Agent Podolak had received hair samples from the police officers that had collected Q117 and Q121 in order to ensure that the hairs found on those items had not come from one of the officers. Podolak replied that he had not received samples from those officers and that, because "anything is possible," he could not say that the hairs recovered from Q117 and Q121 were not from one of the officers. <u>Id.</u> at 585-86. Podolak also stated that it was possible that the police officers who had contact with the victims could have transferred the hairs onto Q117 and Q121 when they subsequently came into contact with those items. <u>Id.</u> at 612.

Tershel questioned Agent Podolak about his ultimate conclusion regarding the hair comparisons:

> **Tershel:** When you were given a head hair sample, … you can't tell us whether or not it absolutely came from that person, isn't it true?
>
> **Podolak:** … [I]f it matches in every observable characteristic, microscopic characteristic, I say it's consistent with or having originated from that individual and I say that because I can't look at everybody's hair in the world to say that there is no-one [sic] else out there that has a hair like this. It's just completely impractical, but in my

23

|  |  |
|---|---|
| | experience I have found that it is very rare that I have two hairs from individuals that I can't distinguish between them. |
| **Tershel:** | And again, that's your judgment call, isn't it? |
| **Podolak:** | That's mine and that of the F.B.I. and the Canadian --- … the Canadian Mounted Police Lab and Scotland Yard lab. |
| **Tershel:** | Do all of these labs look at these hairs? |
| **Podolak:** | Not in this case, … In this case I was the only individual involved in looking at the hairs. |
| **Tershel:** | And in your judgment they matched? |
| **Podolak:** | That's correct. |
| **Tershel:** | It didn't mean they absolutely matched, like fingerprints match? |
| **Podolak:** | No, unless you give me another known sample I can't say. |
| **Tershel:** | Dealing with what you have, sir? |
| **Podolak:** | Dealing with what I have, those hairs match in every observable microscopic characteristic. |
| **Tershel:** | You can't say for sure that they match? |
| **Podolak:** | I can say that they match. |

Id. at 590-92.

On re-cross examination, Tershel specifically asked Podolak about the "caveat statement," which he had included in his report:

|  |  |
|---|---|
| **Tershel:** | In looking at your report, sir, would you agree with this?  I believe that you wrote … "It is noted that hair comparisons do not constitute a basis for absolute personal identification." |
| **Podolak:** | That's correct, that's what we call a caveat statement which we add to the conclusions. |
| **Tershel:** | And you agree with this statement? |

**Podolak:**     Yes, I do.

Id. at 595.  Although Podolak stated it was his "personal opinion" that the hairs found on Q117 and Q121 came from Minnie Warrick, he explained that the "consensus" of the F.B.I., the Canadian Mounted Police, and the Scotland Yard lab was consistent with the "caveat" statement that hair samples do not constitute a basis for absolute personal identification.  Id. at 611-12.

During the defense case, Tershel call Dr. Wecht.  Over the Commonwealth's objection, the court permitted Dr. Wecht to testify as an expert in forensic pathology regarding hair comparison testing.  Id. at 829-58.  Dr. Wecht testified:

**Wecht:**     In my opinion, it is universal, accepted forensic scientific knowledge, that hair identification, gross and microscopic physical characteristics is not exclusive to the rest of the world.  It is not fingerprint identification, in other words.

**Tershel:**     And to what degree can you tell that?  Is there something of class or something of that nature?

**Wecht:**     Different words are used such as consistent with or compatible to or other words.  There are a variety of ways in which you can express it.  You can talk about classes and sub-classes and Caucasian and Negro or Mongoloid or pubic hairs versus head hairs or certain colors.  You can talk about a lot of things, please understand that, but then, you're talking ultimately … If I understand you correctly, about whether or not you can say as a fingerprint-person can analyze that it is this individual to the exclusion of any other individual in the world and the answer is no, you cannot do that by the gross and microscopic characteristics of hair.  You can make a lot of conclusions and you can make a lot of statements, but you can't say that it is this individual and cannot be anybody else in the world.

Id. at 859.

Liekar prepared Steele's post-trial motion.  In it, he asserted that the court had erred in denying the defense's motion *in limine* to exclude Podolak's testimony.  He also argued that the court should have granted the defense's trial objection to the testimony, since Podolak's opinion

that the hairs found on Q117 and Q121 were Minnie Warrick's was more absolute than what he

had indicated in the F.B.I. report.  *Defendant's Brief* in <u>Commonwealth v. Steele</u>, Nos. 686, 687,

688 of 1985 (C.P. Wash. June 2, 1987)).

In addressing this claim in its March 3, 1988 Opinion, the trial court held:

[W]hile [Podolak] testified that an exact positive match of hair samples can never
be made, it was Podolak's expert opinion that the hair he matched from the
defendant's clothing was that of the victim.

Defense counsel fully cross-examined Mr. Podolak on the contents and accuracy
of his findings and conclusions in reference to the subject hair samples.  Further,
Mr. Podolak conceded that his findings were not conclusive…. [quoting from
Trial Tr. at 595].

The law is clear that expert opinion testimony is permitted where the knowledge
supporting the testimony is not within the scope of knowledge of the average
person.  <u>Commonwealth v. Gallagher</u>, 353 Pa.Super. [426], 510 A.2d 735 (1986).
At the trial Mr. Podolak testified that he had specialized training in the field of
chemical hair analysis and then gave his opinion that the hairs he examined from
the victim and the defendant's clothing matched.  The defendant called Dr. Cyril
H. Wecht, a practicing physician and pathologist, to testify as to the origin of the
subject hair sample, and much of his testimony contradicted that of Mr. Podolak.
The question then initially is whether the opinion of evidence is admissible;
however, once the trial court finds such evidence admissible, <u>see</u> <u>Commonwealth
v. Graves</u>, 310 Pa.Super. [184], 456 A.2d 561 (1983), it becomes, as with any
witness, a matter of what credibility and weight the jury will, in the course of their
deliberations, assign to that individual's testimony.  <u>See</u> <u>Commonwealth v.
Bolden</u>, 486 Pa. 383, 406 A.2d 333 (1979) <u>and</u> <u>Commonwealth v. Davis</u>, 331
Pa.Super. 59, 479 A.2d 1077 (1984).

<u>Post-Trial Op.</u>, at 19-20.

Liekar continued to represent Steele in his direct appeal to the Pennsylvania Supreme

Court.  He did not raise the issue in that appeal.

In the PCRA proceeding, Steele argued, as he does in this habeas case in Claim 3, that

Agent Podolak's testimony was "false," "misleading," and without scientific basis, and that by

introducing it the prosecution violated his right to a fair trial and to due process as set forth in

Napue v. Illinois, 360 U.S. 264 (1959), Giglio v. United States, 405 U.S. 150 (1972) and their progeny. In support of this claim, Steele submitted to the state court a declaration from criminalist Dr. Peter R. DeForest, dated May 23, 2000. Dr. DeForest stated that Agent Podolak's trial testimony was not supported by scientific literature and is contrary to the consensus within the community of hair examiners. Ex. 12 of Petitioner's Exhibits and Affidavits, submitted to the PCRA Court on Jan. 24, 2001. Steele further argued, as he does here in Claim 4, that the Commonwealth committed discovery violations[10] when it purportedly failed to disclose pre-trial the true nature of what Podolak's trial testimony would be, and that this violation rendered Tershel and Liekar ineffective in arguing the motion *in limine*. Steele also contended, as he does here, that Tershel and Liekar were ineffective in failing to make the proper objections to Podolak's trial testimony; for failing to adequately cross-examine him; and, for failing to retain a defense expert to conduct hair comparison testing.[11] He argued that if they would have retained a defense expert, that expert could have presented powerful testimony to rebut Podolak's testimony, similar to that contained in Dr. DeForest's declaration.

---

[10] Specifically, Steele argued that the Commonwealth violated Pa.R.Crim.P. 305 (which has since been renumbered to Pa.R.Crim.P. 573), which requires it, when requested, to disclose expert reports and imposes a continuing duty on both parties to disclose additional evidence to the other party. See Steele II, 961 A.2d at 799. The assertion that the Commonwealth violated Rule 305 was made, as it is in this case, within the context of an ineffective assistance of counsel claim (that is, that the Commonwealth's alleged violation "rendered" counsel ineffective). See Amended PCRA Petition, at 14-21; Steele II, 961 A.2d at 799-800.

[11] Steele asserts as part of Claim 4 that Tershel and Liekar were ineffective for failing to retain a defense expert to conduct testing on a cigarette found in Lucille Horner's car. The Pennsylvania Supreme Court rejected this assertion because Steele advanced only "boilerplate allegations" in support of it, and therefore "he is not entitled to relief." Steele II, 961 A.2d at 801-02. Before this Court, Steele likewise has failed to provide any specific argument or support for this assertion.

The Pennsylvania Supreme Court determined that Steele's <u>Napue</u>/<u>Giglio</u> false testimony claim was waived because Steele's direct appeal counsel (Liekar) had not raised it in that appeal. <u>Steele II</u>, 961 A.2d at 799. It further held that to the extent that Steele alleges that Liekar was ineffective for failing to do so, Steele was not prejudiced because the outcome of the appeal would have been the same. <u>Id.</u> ("[W]e do not agree with Appellant that if counsel had raised this claim on direct appeal, the outcome of that appeal would have been different given the overwhelming nature of the evidence against Appellant.").

In disposing of Steele's claim that the prosecution's alleged discovery violation rendered his counsel ineffective at the pre-trial argument on the defense's motion *in limine*, the Pennsylvania Supreme Court held, *inter alia*:

> [W]e fail to see how counsel can be considered ineffective at the motion *in limine* hearing. Based on the information contained in [the F.B.I.] report, trial counsel argued that Mr. Podolak's testimony should be excluded because the opinion described in the report was not generally accepted in the scientific community. It is not apparent what more counsel could have done, and the fact that the agent subsequently testified conclusively does not render counsel's performance ineffective at the motion *in limine* hearing.

<u>Id.</u>

In rejecting Steele's remaining contentions that Tershel and Liekar were ineffective for failing to object to Podolak's trial testimony and for failing to adequately cross-examine, impeach, and rebut his testimony (with scientific literature and with testimony from a defense expert, similar to that which Dr. DeForest included in his declaration), the Pennsylvania Supreme Court held:

> [Appellant contends] that he was prejudiced by trial counsel's failures because the hair evidence was the only direct evidence linking him to the crime. As such, adequate preparation and cross-examination, according to Appellant, would have likely led to a different result. We disagree.

Appellant cannot demonstrate that he was prejudiced by trial counsel's actions. Even if we assume that trial counsel's preparation and cross-examination were inadequate, which we need not take a position on here, we cannot agree with Appellant that the outcome of the proceeding would likely have been different. See [Commonwealth v. Rios, 920 A.2d 790 (Pa. 2007)]. Even if the jury disregarded the hair evidence, the evidence at trial overwhelmingly demonstrated Appellant's guilt. Three different eyewitnesses saw Appellant with the victims at, or near, the Millcraft Shopping Center. The first witness observed Appellant approach one of the victims and point to the car's tire. The same witness watched as Appellant got into the drivers' [sic] seat of the car. The second witness saw Appellant holding the door open for the other two victims as they entered the vehicle. A third witness identified Appellant driving the car around the time in question while his friend's mother-in-law, Ms. Horner, was in the passenger seat. Appellant was then seen driving the victim's car later that day at the Klements Service Station.

Testimony was also introduced regarding a burglary that occurred shortly after the murders at the home of Ms. Woznicak, which was a short distance from the Klements Service Station. Appellant was later observed by three witnesses unloading the stolen items from Ms. Warrick's [sic] vehicle into his girlfriend's home. Ms. Woznicak found a strip of cloth that was later determined to be from the dress worn by Ms. Warrick the day she was murdered. Moreover, the bodies of the victims were found approximately 600-800 yards from Appellant's childhood home. The Commonwealth introduced testimony that Appellant was a black-belt in karate, which was important because the coroner found that the victims were likely killed by blunt trauma by a human hand. Finally, Ms. Hair testified that just three days before the murder, Appellant tried to gain access to her and her vehicle by fabricating a problem with the vehicle's tire, going so far as to feign seeing a nail in the tire and a pair of scissors under the tire. All of this evidence is sufficient to establish Appellant's guilt, even if the jury disregarded the hair comparison evidence. Thus, Appellant's claim must fail as he cannot demonstrate prejudice.

Id. at 801.

In this proceeding, I granted Steele's unopposed motion for discovery in which he requested access to the hair samples taken from Q117, Q121, and the victims. [ECF Nos. 17, 18]. Dr. DeForest examined that evidence and prepared a report, dated April 19, 2011. He concluded:

There were some similarities and significant differences between the K9 hairs from the victim and the Q117 and Q121 hairs from two of the items of clothing in the closest of [Steele].

I was unable to find any hairs in either the Q117 of Q121 samples obtained from garments in Mr. Steele's wardrobe that were sufficiently similar to the K9 samples to support a conclusion that the Q117 or the Q121 samples contained hairs that had originated from the same source as the K9 sample.

[ECF No. 48-1 at 4, April 19, 2011 Report of Dr. DeForest].

### (2)     Legal Analysis

### (a)     Ineffective Assistance Claims

Because the Pennsylvania Supreme Court denied on the merits the ineffective assistance of counsel claims at issue here, my analysis of those claims is governed AEDPA's standard of review. Thus, it is not for me to decide whether the Pennsylvania Supreme Court's decision was right or wrong. Rather, I have the authority to issue the writ of habeas corpus only if its adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The U.S. Supreme Court recently stressed the "highly deferential" review that I must accord the state court's decision:

We have explained that "an unreasonable application of federal law is different from an incorrect application of federal law." Williams v. Taylor, 529 U.S. 362, 410, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Indeed, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id., at 411, 120 S.Ct. 1495. Rather, that application must be "objectively unreasonable." Id., at 409, 120 S.Ct. 1495. This distinction creates "a substantially higher threshold" for obtaining relief than de novo review. Schriro v. Landrigan, 550 U.S. 465, 473, 127 S.Ct. 1933, 167

L.Ed.2d 836 (2007). AEDPA thus imposes a "highly deferential standard for evaluating state-court rulings," Lindh v. Murphy, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and "demands that state-court decisions be given the benefit of the doubt," Woodford v. Visciotti, 537 U.S. 19, 24, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam).

Renico v. Lett, — U.S. — , 130 S.Ct. 1855, 1862 (2010). The Court also has recently elaborated:

> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. Cf. Felker v. Turpin, 518 U.S. 651, 664, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244). It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. Jackson v. Virginia, 443 U.S. 307, 332, n. 5, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring in judgment). As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Harrington v. Richter, — U.S. —, 131 S.Ct. 770, 786-87 (2011). See also Wiggins v. Smith, 539 U.S. 510, 521 (2003) (it is not enough for a petitioner to show that the state court's adjudication of any of his claims was an "incorrect or erroneous" application of U.S. Supreme Court precedent); Waddington v. Sarausad, 555 U.S. 179, 190 (2009) (where it is the state court's application of governing federal law that is challenged, "the state court's decision must be shown to be not only erroneous, but objectively unreasonable.") (internal citations and quotations omitted); Schriro v. Landrigan, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold").

31

The "clearly established Federal law" for AEDPA purposes in which to analyze Steele's claim of ineffective assistance is set forth in Strickland v. Washington, 466 U.S. 668 (1984). Under Strickland, Steele must show that his counsel's representation fell below an objective standard of reasonableness. 466 U.S. at 688. The law presumes that counsel was effective. Id. at 689. Strickland also requires Steele to demonstrate that he was prejudiced by his counsel's alleged deficient performance. This requires him to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.[12]

The Pennsylvania Supreme Court's adjudication was not "contrary to" Strickland. In Commonwealth v. Pierce, 527 A.2d 973, 976-77 (Pa. 1987), it held that Pennsylvania law for judging ineffectiveness corresponds with the Strickland standard. See also Commonwealth v. Kimball, 724 A.2d 326 (Pa. 1999); Jacobs v. Horn, 395 F.3d 92, 106 (3d Cir. 2005) ("We have previously ruled that Pennsylvania's test for assessing ineffective assistance of counsel claims is not contrary to Strickland.") (citing Werts v. Vaughn, 228 F.3d 178, 204 (3d Cir. 2000)). In Steele II, it outlined the elements of such a claim – failure to raise a meritorious claim, lack of strategic reason, and prejudice[13] – and cited to Strickland, Pierce, and the progeny of those cases.

_____

[12]    The Court in Strickland noted that although it had discussed the performance component of an effectiveness claim prior to the prejudice component, there is no reason for an analysis of an ineffectiveness claim to proceed in that order. 466 U.S. at 697. Consequently, if it is more efficient to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, as it is here, this course should be followed. Id.

[13]    Although Pennsylvania courts articulate a three-prong test for gauging ineffective assistance claims and Strickland sets forth its test in two prongs, the legal evaluation is the same, and the differences merely reflect a stylistic choice on the part of state courts. Rompilla v. Horn,

<u>Steele II</u>, 961 A.2d at 796-97. Therefore, the Pennsylvania Supreme Court applied the correct

legal standard, and that is sufficient to satisfy review under the "contrary to" clause of

§ 2254(d)(1). <u>Williams</u>, 529 U.S. at 406 ("a run-of-the mill state-court decision applying the

correct legal rule from [Supreme Court] cases [does] not fit comfortably within § 2254(d)(1)'s

'contrary to' clause."); <u>Jacobs</u>, 395 F.3d at 106; <u>Werts</u>, 228 F.3d at 202-04.

Thus, the only remaining questions for me to decide is whether the Pennsylvania

Supreme Court's adjudication of these ineffective assistance claims was an "unreasonable

application of" <u>Strickland</u> or "resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in the state court proceeding."

28 U.S.C. § 2254(d)(1)-(2). In conducting this analysis, I am cognizant that:

> Establishing that a state court's application of <u>Strickland</u> was unreasonable under
> § 2254(d) is all the more difficult. The standards created by <u>Strickland</u> and
> § 2254(d) are both "highly deferential," [<u>Strickland</u>, 466 U.S.] at 689, 104 S.Ct.

---

355 F.3d 233, 248 (3d Cir. 2004), rev'd on other grounds sub nom., 545 U.S. 374 (2005); <u>Werts</u>,
228 F.3d at 202-04.

    At some places in <u>Steele II</u>, the Pennsylvania Supreme Court stated that Steele was not
prejudiced because he failed to demonstrate that counsel's alleged ineffectiveness "would have"
produced a different outcome. <u>Strickland</u> and <u>Pierce</u> require that the petitioner demonstrate a
"reasonable probability" of a different outcome. The U.S. Supreme Court has counseled that a
federal habeas court should not be quick to assume that the state court applied the wrong law,
even if the state court was imprecise in language it used in evaluating a claim. <u>Woodford v.
Visciotti</u>, 537 U.S. 19, 23-24 (2002) (per curiam) (finding the Court of Appeals for the Ninth
Circuit's "readiness to attribute error [to the state court] is inconsistent with the presumption that
state courts know and follow the law," and is "also incompatible with § 2254(d)'s 'highly
deferential standard for evaluating state-court rulings,' which demands that state court decisions
be given the benefit of the doubt."); <u>see also</u> <u>Williams v. Beard</u>, 637 F.3d 195, 233 n.30 (3d Cir.
2011). In <u>Visciotti</u>, the Supreme Court admitted that even it has stated imprecisely <u>Strickland</u>'s
prejudice standard at points in some of its decisions, and noted that the California Supreme
Court's shorthand reference to the <u>Strickland</u> standard that was not entirely accurate "can no
more be considered a repudiation of the standard than can this Court's own occasional
indulgence in the same imprecision." 537 U.S. at 24 (citing <u>Mickens v. Taylor</u>, 535 U.S. 162,
166 (2002); <u>Williams</u>, 529 U.S. at 393).

2052; <u>Lindh v. Murphy</u>, 521 U.S. 320, 333, n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481
(1997), and when the two apply in tandem, review is "doubly" so, [<u>Knowles v.</u>
<u>Mirzayance</u>, 556 U.S. 111, 129 S.Ct. 1411, 1420 (2009)]. The <u>Strickland</u>
standard is a general one, so the range of reasonable applications is substantial.
556 U.S., at —, 129 S.Ct. at 1420.

<u>Harrington</u>, 131 S.Ct. at 788. <u>See also</u> <u>Knowles</u>, 129 S.Ct. at 1420 ("[B]ecause the <u>Strickland</u>

standard is a general standard, a state court has even more latitude to reasonably determine that a

defendant has not satisfied that standard.") (citing <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664

(2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's

specificity. The more general the rule, the more leeway courts have in reaching outcomes in

case-by-case determinations.")). Moreover, I may only consider the record that was before the

state court. <u>Cullen</u>, 131 S.Ct. at 1398-1400. Therefore, with respect to these ineffectiveness

claims, I cannot consider Dr. DeForest's April 19, 2011 report in my evaluation of whether the

state court's adjudication was objectively unreasonable.[14]

It is true that Agent Podolak's testimony was the only expert opinion that linked physical

evidence gathered from Steele (the hairs found on his clothing) with the victims (a control

sample of Minnie Warrick's hair). However, his testimony was far from the only evidence

introduced to establish that Steele had been with them. Stitler, Oyler, and Crothers testified that

they *saw Steele with the victims* in or near the Millcraft Center parking lot. Their testimony was

corroborated by Joseph and Victor Klements and Joan Whitlock's neighbors, who testified that

they *saw Steele driving Lucille Horner's car, or a car matching her car's description*, on the day

of the murders. Additionally, through the testimony of several of its witnesses, the

---

[14]     If I could consider Dr. DeForest's report, I still would conclude that Steele is not entitled
to relief on these ineffectiveness claims because he has not demonstrated that he was prejudiced
by his counsel's alleged deficient performance. I would reach this same conclusion even under a
*de novo* review.

Commonwealth presented evidence to demonstrate that on the day of the murders, Steele *gave Minnie Warrick's necklace to Willie Scarfanski, and left part of the dress that she had been wearing that day at the Woznicak's home*. All of this evidence placed Steele with the victims the day they were murdered, and Steele has not convinced this Court that Podolak's testimony was the key to the jury crediting the Commonwealth's case against him.

Moreover, Steele testified and the jury was able to assess his credibility. He denied encountering the victims and gave what was, at least from a reading of the transcript, an utterly unbelievable account of his actions the day of the murders. It is not surprising that the jury rejected his testimony.

In conclusion, based on the strength of the above-cited evidence and the weakness of Steele's own trial testimony, I conclude that the Pennsylvania Supreme Court's conclusion that Steele was not prejudiced by his counsel's alleged ineffectiveness was objectively reasonable under AEDPA. Its decision to deny relief on these claims was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 131 S.Ct. at 786-87. As the Third Circuit Court of Appeal has noted: "[i]t is firmly established that a court must consider the strength of the evidence in deciding whether the Strickland prejudice prong has been satisfied." Buehl v. Vaughn, 166 F.3d 163, 172 (3d Cir. 1999) (citing Strickland, 466 U.S. at 695). This is so because "[a] court simply cannot" "determine whether there is a reasonable probability that, but for counsel's errors, the result of the trial would have been different[,]" "without considering the strength of the evidence against the accused." Id. Therefore, Steele is not entitled to habeas relief on these claims of ineffectiveness.

**(b)      False Evidence Claim**

Steele argues that Agent Podolak's testimony was unreliable and therefore the trial court erred in allowing the prosecution to introduce it.  The trial court determined that Podolak's testimony was admissible under state evidentiary law, see Trial Tr. at 8-9, 582-83; see also Post-Trial Op., at 19-20, and this Court may not re-examine state court determinations on state law questions.  See, e.g., Estelle, 502 U.S. at 67-68; Priester, 382 F.3d at 402; Real, 600 F.3d at 309-10; Johnson v. Rosemeyer, 117 F.3d 104, 109 (3d Cir. 1997) ("[W]e have stated that 'it is well established that a state court's misapplication of its own law does not generally raise a constitutional claim.  The federal courts have no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension.'" (quoting Geschwendt v. Ryan, 967 F.2d 877, 888-89 (3d Cir. 1992)).

Because Steele cannot obtain habeas relief by demonstrating that the trial court may have erred under state law in permitting the introduction of Podolak's testimony, he repackages his challenge to implicate his federal constitutional rights.  He contends that Dr. DeForest's April 19, 2011 report, as well as the scientific literature on the subject, demonstrate that Podolak's testimony was "false," and that by introducing it the Commonwealth violated his right to a fair trial and to due process as set forth in Napue v. Illinois, 360 U.S. 264 (1959) and Giglio v. United States, 405 U.S. 150 (1972).  See also Lambert, 387 F.3d at 242-43.

In Napue and Giglio, the prosecution made agreements with witnesses in exchange for their testimony.  Both witnesses falsely denied the existence of the agreements, and the prosecutors failed to correct their false testimony.  In Napue, the Supreme Court held that a conviction is obtained through the use of false evidence, and therefore violates the Fourteenth

36

Amendment, when the state, "although not soliciting false evidence, allows it to go uncorrected when it appears." 360 U.S. at 269. In <u>Giglio</u>, the government's case depended almost entirely on the testimony of a witness whom the government promised it would not prosecute if he testified. The trial prosecutor had not himself made the agreement and was unaware of it, but the Court charged him with knowledge of the agreement made by his predecessor. The Court held that because the evidence was relevant to the jury's assessment of the credibility of the witness, a new trial would be "required if 'the false testimony could ... in any reasonable likelihood have affected the judgment of the jury[.]'" <u>Giglio</u>, 405 U.S. at 154 (quoting <u>Napue</u>, 360 U.S. at 271).

This case does not present a <u>Napue</u>/<u>Giglio</u> violation. In order to establish such a violation, Steele must show that: (1) Agent Podolak committed perjury; (2) the prosecution knew or should have known of his perjury; (3) the testimony went uncorrected; and (4) the testimony was material, meaning that there is any reasonable likelihood that the false testimony could have affected the verdict. <u>See</u>, <u>e.g.</u>, <u>Lambert</u>, 387 F.3d at 242-43; <u>Guzman v. Sec'y Dep't of Corr.</u>, — F.3d — , 2011 WL 5083235, *9 (11th Cir. Oct. 27, 2011); <u>Rosencrantz v. Lafler</u>, 568 F.3d 577, 583-84 (6th Cir. 2009), <u>cert.</u> <u>denied</u>, 130 S.Ct. 2401 (2009).

There is no evidence that Agent Podolak committed perjury or that the Commonwealth knew or should have known of his purported perjury. He testified that in his expert opinion, the hairs from Q117 and Q121 were Minnie Warrick's hairs. Dr. DeForest disagrees with Agent Podolak's testimony and, after conducting his own analysis, has reached the conclusion that the hairs found on Q117 of Q121 were insufficiently similar to Minnie Warrick's control sample. Dr. DeForest's report does not demonstrate that Agent Podolak's trial testimony was perjured. At most, Dr. DeForest report shows that two experts who analyzed the same evidence reached opposing conclusions. Even if Dr. DeForest's conclusion is more credible, a decision I do not

and need not make here, that does not establish that Agent Podolak's testimony was false, or that the Commonwealth knowingly presented false evidence.

Moreover, Steele has failed to demonstrate that "there is any reasonable likelihood that the false testimony could have affected the verdict." As detailed above, the Commonwealth presented significant evidence independent of Agent Podolak's testimony to prove to the jury that Steele was the man who had been seen last with the victims and that it was he who had killed them.

For all of the above-cited reasons, Steele's "false evidence" claim is denied.

This claim is also denied because, even if Steele demonstrated that the introduction of Agent Podolak's testimony implicated his federal constitutional rights – and he has not – any error would be harmless in light of the other evidence introduced at his trial. The harmless error evaluation applicable to this claim is that which is set forth in <u>Brecht v. Abrahamson</u>, 507 U.S. 619 (1993), which requires that in order to grant habeas relief a federal habeas court must find that a trial error had a "substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. at 637 (quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 776 (1946)). <u>Fry v. Pliler</u>, 551 U.S. 112 (2007). <u>See</u> <u>also</u> <u>Guzman</u>, — F.3d at __ , 2011 WL 5083235, *17 (applying <u>Brecht</u> harmless error analysis to a <u>Napue</u>/<u>Giglio</u> claim); <u>Rosencrantz</u>, 568 F.3d at 588-92 (same). <u>See</u> <u>also</u> <u>Robinson v. Arvonio</u>, 27 F.3d 877, 884-87 (3d Cir. 1994) (same), *vacated on other grounds*, 513 U.S. 1186 (1995).[15] "When a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had substantial and injurious effect or

_____

[15]     The U.S. Supreme Court vacated the Third Circuit Court of Appeals' decision in <u>Robinson</u> and remanded for further consideration in light of <u>O'Neal v. McAninch</u>, 513 U.S. 432 (1995), in which the Court clarified how a federal habeas court should apply the <u>Brecht</u> harmless error standard.

influence in determining the jury's verdict, that error is not harmless."  O'Neal v. McAninch, 513 U.S. 432, 436 (1995) (quotation marks omitted); Bond v. Beard, 539 F.3d 256, 276 (3d Cir. 2008).  Because I am not in grave doubt that the introduction of Agent Podolak's testimony had a "substantial and injurious effect or influence" on the jury's verdicts, any error was harmless under Brecht.  For this reason, in addition to the reasons discussed above, this claim is denied.


**B.**    **The *Voir Dire***

   **(1)**    **Counsel's Alleged Failure to Conduct Adequate Individual *Voir Dire* on Racial Bias (Claim 5)**

During *voir dire*, Tershel asked the venire the following question related to racial bias: "Do you feel that black people are more likely to commit a crime than white people?"  Steele contends: "[t]hat question alone does not begin to ferret out the potential biases likely to exist in a case such as this one," and that "[c]ounsel rendered ineffective assistance by failing to ask *voir dire* questions probing potential racial bias."  [ECF No. 22, Memorandum Of Law In Support Of Petition, at 97].

In ruling on this claim, the PCRA Court held:

[T]here are two partial transcripts of [the] voir dire proceedings.  These transcripts indicate that nineteen of the thirty-three jurors were asked at least one question concerning potential racial bias.  Indeed, ... one prospective juror, Mr. Chester Borkowski, was questioned four times about racial bias before being rejected by defense counsel.  See Partial Transcript of Voir Dire filed August 3, 1987.  Many of the nineteen prospective jurors asked about potential racial bias were asked specifically whether they felt that black people were more likely to commit a crime than white people.  Of the thirteen prospective jurors not questioned about potential racial bias, six were excused based on a challenge for cause by the Commonwealth as a result of their answers to questions concerning the imposition of the death penalty.  See Partial Transcripts of Voir Dire filed August 3, 1987, and March 3, 2001.  These six prospective jurors were never asked any questions by the petitioner's trial counsel because they were excused before the trial counsel asked them any questions.

Having presided over the voir dire proceedings and having reviewed the record, this court cannot conclude that Petitioner's trial counsel was ineffective for failing to adequately question prospective jurors as to racial bias…. Questioning jurors on voir dire is a skill that requires attorneys to make decisions based upon verbal and physical cues as well as, at time, instinct. An effective attorney may refrain from questioning a prospective juror repeatedly about racial bias if he or she believes that doing so may anger, embarrass, or annoy a potential juror that the attorney finds acceptable.

PCRA Court Op., at 17-18. The PCRA Court further held that "trial counsel's question concerning whether the prospective jurors felt that black people were more likely to commit crimes than white people was sufficient to elicit possible racial bias." Id. at 19 n.7.

The Pennsylvania Supreme Court agreed with the PCRA Court's reasoning and held that Steele had not demonstrated that Tershel's representation was objectively unreasonable or that he was prejudiced. Steele II, 961 A.2d at 803. There is no basis for this Court to disturb the state court's decision under AEDPA's deferential standard of review. See Harrington, 131 S.Ct. at 788. I may only issue the writ of habeas corpus on this claim if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). It was none of those things.

Steele labels the state court's decision "entirely speculative" because Tershel testified at the *May 30, 2000* PCRA hearing that he could not recall specifics about the *voir dire* proceeding.

That argument is unconvincing.[16]  That Tershel could not remember specifics about a *voir dire* proceeding *that occurred more than fourteen years earlier* does not establish that he lacked a strategy or that his conduct at the time was objectively unreasonable.  Tershel understandably could not recall details about the long-ago proceeding.  In any event, as the state court noted, Tershel did ask many prospective jurors whether they felt African Americans were more likely to commit a crime than white people.  That question was utilized to elicit possible bias.  When necessary, Tershel asked follow-up questions, as his examination of Borkowski reveals:

> **Q.**  Do you believe that black people are more likely to commit a crime than white people are?

> **A.**  Not more likely.  I think the circumstances would probably dictate that.

> **Q.**  For example, what do you mean?

> **A.**  Well, almost everybody is a product of environment, and if somebody happens to come from the ghetto, be it black or whatever, I am sure that the opportunity probably presents itself more often, I would think, it's more acceptable.

> **Q.**  Do you think that black people are more likely to be in that type of environment that you are referring to?

> **A.**  I would have to say that probably statistically speaking, it would present itself as such, I would think, but statistics, again, are not always honest. You can't always believe the figures.  I've seen enough figures in my line of work that don't always tell the honest-to-God truth.

> **Q.**  Is the fact that the defendant here is black and the victims were white, do you think that is going to make [sic] an effect in your decision making process?

> **A.**  No.  I live next door to a couple black families, got along with them well, had no problems.  I being a supervisor, I have to deal with the multi-racial situations and I have no problems with that either.

---

[16]  The argument also misses the point.  The ultimate "question is not whether counsel's choices were strategic, but whether they were reasonable."  <u>Bullock v. Carver</u>, 297 F.3d 1036, 1047-48 (10th Cir. 2002) (quoting <u>Roe v. Flores-Ortega</u>, 528 U.S. 470, 477 (2000)).

Partial Tr. of *Voir Dire* filed 8/3/1987 at 6-7.  Finally, as the PCRA Court suggested, Tershel "reasonably could have concluded that asking [some] prospective jurors questions about racial prejudice would do more harm than good."  Jacobs, 395 F.3d at 118.

In conclusion, Steele has not overcome Strickland's strong presumption that his counsel's conduct fell within the wide range of reasonable professional assistance, or that he was prejudiced.  He is denied relief on this claim because has not shown that the Pennsylvania Supreme Court's adjudication of this claim was an objectively unreasonable application of Strickland or of the facts under AEDPA's standard of review.  28 U.S.C. § 2254(d).  See also Harrington, 131 S.Ct. at 788 ("When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.").


### (2)    Failure to Receive a Complete Set of *Voir Dire* (Claim 6)

A partial transcript of the *voir dire* of six prospective jurors was filed with the trial court on August 3, 1987.[17]  In his PCRA proceeding, Steele claimed that the failure to prepare the transcripts of the entire *voir dire* violated his right to due process, a meaningful appeal, and the effective assistance counsel.  The PCRA Court instructed Steele's counsel to identify particular prospective jurors whose testimony they wished to have transcribed.  It also provided counsel

---

[17]    The PCRA Court explained that there were 109 prospective jurors, 89 of which were subject to *voir dire*.  The state court record filed by the Commonwealth contains the proposed *voir dire* questions submitted by both the prosecution and the defense.  Those documents have the trial court's written notations on them, which indicate which questions it allowed.  Out of 72 prospective jurors, 12 were chosen for the jury.  Another 17 were subject to *voir dire* for selection as alternate jurors.  Two alternates were selected, but never used.  PCRA Court Op., at 16 n.6.

with the trial court's notes of the jury selection.  Counsel submitted a post-hearing motion in which they requested the transcription of specific jurors within the *voir dire*, but they did not concede that anything less than the production of the entire transcript would satisfy Steele's federal constitutional rights.

By order dated July 5, 2000, the PCRA Court ordered that the *voir dire* of an additional 33 prospective jurors be transcribed.  Thus, it appears that 39 out of the 89 prospective juror's *voir dire* has been transcribed.

After Steele filed his petition in this case, I directed that, if possible, the Commonwealth must submit those portions of the *voir dire* that had not yet been transcribed.  The Commonwealth subsequently informed the Court that it had contacted the trial court reporter (who retired in 1999), and she stated that a full transcription of the *voir dire* had never been done.  She also informed the Commonwealth that she did not have any notes or transcriptions of the proceeding.  The Commonwealth also contacted the records department for the county and requested that it search for any files, documents, notes, stenographic notes, or transcriptions regarding this case.  The records department informed the Commonwealth that it does not possess any such information.

The Third Circuit Court of Appeals has held:

> It is indisputably true that a criminal defendant has the right to an adequate review of his conviction, *i.e.*, a sufficiently complete record.  Mayer v. City of Chicago, 404 U.S. 189, 198, 92 S.Ct. 410, 30 L.Ed.2d 372 (1971).  However, as the District Court aptly pointed out, neither the Supreme Court, nor our Court, has held that due process requires a verbatim transcript of the entire proceedings or that an incomplete record confers automatic entitlement to relief.  This Court has recognized a defendant's request for a complete transcript only when the defendant has shown a "colorable need" for the transcript.  Karabin v. Petsock, 758 F.2d 966, 969 (3d Cir. 1985) (citing Mayer, 404 U.S. at 195, 92 S.Ct. 410).  Specifically, "[a] criminal defendant must first show a 'colorable need' for a complete transcript before the state must meet its burden of showing that something less will suffice." Id.

43

Fahy v. Horn, 516 F.3d 169, 190 (3d Cir. 2008) (footnote omitted).

A good portion of the *voir dire* proceedings was transcribed during the state court proceedings. Steele has not shown a "colorable need" for the remaining portion of the *voir dire* transcript. The specific instance of wrongdoing arising out of the *voir dire* is his claim that his counsel was ineffective for failure to conduct adequate individual *voir dire* on racial bias. Steele has failed to point to one specific incident in the *voir dire* that has been transcribed that would support this claim, and he has provided this Court with no reason whatsoever to conclude that the remaining portion of the *voir dire* proceeding, had it been transcribed, would have yielded evidence in support. Accordingly, he is not entitled to habeas relief on this claim and it is denied.

### C. Challenge to the Guilt-Phase Instructions

#### (1) Identification Testimony (Claim 7)

During its charge to the jury, the trial court instructed generally:

In assessing the value of identifying witness' testimony there are two things which are to be considered by you as jurors. One, the general credibility of the witness as I explained that term to you, meaning believability, trustworthiness and the weight you want to give that testimony and two, the basis upon which the identification was made.

Trial Tr. at 1492-93.

Steele contends that the court should have given a cautionary jury instruction specifically pertaining to Harry Crothers' identification testimony and to cross-racial identification pursuant to Commonwealth v. Kloiber, 106 A.2d 820 (Pa. 1954).[18] "Habeas relief for a due process

---

[18] Pennsylvania's Suggested Standard Criminal Jury Instruction 4.07 is dictated by the principles of Kloiber.

violation concerning an absent or defective jury instruction is available only when the absence of an instruction, or a defective instruction, infects the entire trial with unfairness." Real, 600 F.3d at 309 (quoting Albrecht v. Horn, 485 F.3d 103, 129 (3d Cir. 2007), which cited Cupp v. Naughten, 414 U.S. 141, 147 (1973)).

In Kloiber, the Pennsylvania Supreme Court held:

> where the witness is not in a position to clearly observe the assailant, or he is not positive as to identity, or his positive statements as to identity are weakened by qualification or by failure to identify defendant on one or more prior occasions . . . the court should warn the jury that the testimony as to identity must be received with caution.

106 A.2d at 826-27 (citations omitted).[19] Steele asserts that a Kloiber instruction was warranted because of the alleged "racially-charged atmosphere of the trial," and because Crothers "gave a statement to the police just one week after the homicides indicating that he could identify the car but was not in a position to clearly see the occupants (except to observe that three old woman [sic] were in the car and a bald black man was driving it). Indeed, [Crothers] stated unequivocally that he 'could not see all his [the driver's] features." [ECF No. 22, Memorandum Of Law In Support Of Petition, at 119].

Tershel and Liekar had requested that a Kloiber cautionary instruction be given with respect to Crothers' testimony, but the trial court denied their request.[20] That state-law

---

[19]     The trial court did provide a cautionary instruction regarding Mildred Stitler's identification testimony because at a hearing on December 11, 1985, she had made an identification of Steele "which appears to conflict or contradict with parts of her testimony given at [the] trial." Trial Tr. at 1491-92.

[20]     While there may have been an issue for the jury regarding the *quality* of Crothers' observations, his testimony indicated that he had the *opportunity* to observe Steele. This distinction is an important one as it relates to whether a Kloiber instruction is warranted. As the Superior Court of Pennsylvania has explained, when a prosecution witness' testimony establishes

determination is not subject to re-examination by this Court. 28 U.S.C. § 2254(a). See, e.g., Estelle, 502 U.S. at 67-68; Real, 600 F.3d at 309-10. In addressing the issue again on post-trial motions, the trial court held:

> We find [the general instruction on identification testimony, which is set forth above] adequate to cover the requested points. There was no error in the trial court's decision to deny the aforementioned requested points for charge. We also note that Mr. Crothers was positively not equivocal in his identification of the defendant during both direct and cross-examination. (N.T. 273-281). A cautionary instruction concerning Mr. Crothers['] testimony was not warranted under these circumstances.

Post-Trial Op., at 72.

Liekar did not pursue the issue on direct appeal, and Steele claims that he was ineffective for failing to do so; that his counsel was ineffective for failing to seek a Kloiber cautionary instruction regarding cross-racial identification; and, that the trial court's failure to give a Kloiber cautionary instruction with respect to both Crothers' testimony and cross-racial identification violated his right to a fair trial and to due process.

Steele has not demonstrated that the trial court's failure to give the cautionary instruction regarding either Crothers' testimony or cross-racial identification violated his federal

---

that he or she had ample opportunity to observe the defendant, the appropriate way to address the reliability of the identification is through cross-examination. Commonwealth v. Cleveland, 703 A.2d 1046, 1049 (Pa. Super. 1997) (citing Commonwealth v. Jamison, 171 A.2d 541 (Pa. Super. 1961)). In such a case, a Kloiber instruction is not warranted. Id. In contrast, when the evidence submitted at trial reveals that there is a question as to whether the witness was able to observe the defendant at all, then the identification is suspect and the trial court should give a Kloiber instruction to the jury. Id. (comparing Jamison, 171 A.2d at 542 (witness had ample opportunity to observe defendant, and cross-examination sufficient to address reliability of the identification) with Commonwealth v. Simmons, 647 A.2d 568 (Pa. Super. 1994) (Kloiber instruction warranted because "record revealed that from where the witness claimed to be during the crime, he was either unable to view the defendant, or had his view obstructed by a railing or pole."). Crothers' testimony established that he had sufficient opportunity to observe Steele; thus, it became incumbent upon Tershel to highlight any problems with the quality of Crothers' observation through cross-examination (which he did). Trial Tr. at 280.

constitutional rights. While the Due Process Clause precludes a jury from convicting a defendant on the basis of unreliable identification evidence, <u>Manson v. Brathwaite</u>, 432 U.S. 98 (1977), an identifying witness need not be free from doubt. Steele has not directed this Court to any controlling authority that holds that the federal constitution *required* that the trial court provide a cautionary jury instruction under the circumstances presented here.

With respect to Steele's ineffectiveness claims at issue here, he has not shown that his counsel's conduct was objectively unreasonable under <u>Strickland</u>, or that he was prejudiced. Counsel was able to secure a <u>Kloiber</u> instruction pertaining to Mildred Stitler's identification testimony, and the trial court's more general instruction was sufficient to cover all other witnesses' identification testimony, including Crothers' testimony.

For all of these reasons, Steele is not entitled to habeas relief on the claims at issue here and they are denied.

### (2) The Unanimity Instruction (Claim 8)

Steele contends that the unanimity instruction that the trial court gave to the jury during the guilt-phase of his trial improperly coerced a verdict, in violation of his due process rights, and that his counsel was ineffective for failing to object. In giving the instruction at issue, the court stated:

> No matter what your verdict may be, it must be unanimous, that is, it must reflect the unanimous choice of each and everyone [sic] of you on each charge or count. Each and everyone [sic] of you must concur and agree on the final verdict which you will return here in open court. Any verdict which does not reflect the view of each and everyone [sic] of you would be improper and we could not accept it. In other words, you cannot come back in court and say that you are seven to five, nine to three, ten to two or anything like that. The verdict must be unanimous, either guilty or not guilty on each charge.

Trial Tr. at 1484.

Steele contends that "[b]y telling the jury that it could not return unless it reached a unanimous verdict, the trial court left it with only one possible interpretation: that individual determinations contrary to the majority would not be tolerated. In doing so, the trial court invaded the factfinding process and created the very real risk that one or more jurors would surrender his or her conscientiously held views in order to reach a unanimous decision." [ECF No. 22, Memorandum Of Law In Support Of Petition, at 128].

I am not persuaded by Steele's strained reading of the trial court's instructions. The court explained, in accordance with the law, that the verdicts on guilt had to be unanimous. Steele has not cited to any case in which an instruction similar to that which was given in his case was found to be unconstitutional. Although "any criminal defendant, and especially any capital defendant, being tried by a jury is entitled to the coerced verdict of that body[,]" Lowenfield v. Phelps, 484 U.S. 231, 241 (1988),[21] none of the cases upon which Steele relies supports his claim that the instruction at issue violated his constitutional rights. He also has not demonstrated that the unanimity instruction infected his entire trial with unfairness. See, e.g., Real, 600 F.3d at 309.

Perhaps realizing the futility of his claim regarding the unanimity instruction, Steele also argues that the trial court's instruction on reasonable doubt was erroneous "by not making it clear to the jury that, should the prosecution not prove each element of the offenses charged beyond a reasonable doubt, it must find [Steele] not guilty." [ECF No. 22, Memorandum Of Law In Support Of Petition, at 128]. Trial courts are free to provide juries with a definition for

---

[21] In Lowenfield, the U.S. Supreme Court rejected a habeas petitioner's contention that the trial court, during the sentencing phase of a capital case, violated his due process and Eighth Amendment rights when it repeatedly instructed jurors, who had indicated that they were having difficulty reaching a verdict, to continue to deliberate and that if they could not reach a unanimous verdict it would impose a life sentence.

reasonable doubt.  See, e.g., Victor v. Nebraska, 511 U.S. 1, 5 (1994).  "[T]he Constitution does

not require that any particular form of words be used in advising the jury of the government's

burden of proof."  Id. (internal citations omitted).

The trial court instructed the jury on reasonable doubt as follows:

… So members of the jury, the Commonwealth has the burden of proof and this
burden of proof never shifts from the Commonwealth.  It is required to prove it's
[sic] case in every material portion and element of it's [sic] case beyond a
reasonable doubt, including the degree of the crime.

Now, you've heard that word so much that you probably ask yourselves what is a
reasonable doubt….  If you have any such doubt as to any material portion of the
Commonwealth's case, it's your duty to resolve it in favor of the defendant and
acquit him.  If you have no such doubt, it is equally your duty to convict him.

Now, the Commonwealth is not required to prove it's [sic] case beyond all doubt
and to mathematical certainty nor must it demonstrate the complete impossibility
of innocence.  It has been said that there is some doubt at least about everything
and anything but there is that high duty upon the Commonwealth of proving it's
[sic] case beyond a reasonable doubt.

If your minds are fairly satisfied on the facts and on the evidence so much as to
would [sic] induce a man of reasonable fairness and judgment to take the facts as
true and act upon them in a matter of highest importance to him, then it would be
sufficient to rest a verdict upon them.  If, after an intercomparison and
consideration of all evidence your minds are in a condition that you cannot say
that you are convinced beyond a reasonable doubt, the accused is guilty, then you
must find him not guilty.

Trial Tr. at 1484-46.  See also id. at 1499-1510 (reiterating with respect to each crime that the

Commonwealth must prove that Steele is guilty beyond a reasonable doubt).

Steele has not shown that the reasonable doubt instruction given at his trial was

erroneous.

Finally, because Tershel and Liekar cannot be found ineffective for failing to raise a

meritless claim, Strickland, 466 U.S. at 691, Steele has not demonstrated that his counsel was

ineffective in failing to challenge either the unanimity instruction or the reasonable doubt instruction at trial and on direct appeal.

### D. The Prosecution's Closing Argument (Claim 9)

Steele claims that the prosecutor's closing argument violated his due process rights because he improperly appealed to racial prejudice, vouched for the Commonwealth's own witnesses, offered personal opinions about the case, and made personal attacks on the defense's witnesses. Steele also claims that Tershel and Liekar were ineffective for failing to object to the alleged instances of improper argument.

In evaluating a petitioner's claim that a prosecutor committed misconduct during closing argument, the Third Circuit Court of Appeals has explained:

> The Supreme Court has held that federal habeas relief may be granted when the "prosecutorial misconduct may 'so infec[t] the trial with unfairness as to make the resulting conviction a denial of due process.'" Greer v. Miller, 483 U.S. 756, 765, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). The Court further opined that for due process to have been offended, "the prosecutorial misconduct must be ';of sufficient significance to result in the denial of the defendant's right to a fair trial.'" Id. (citing United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (quoting United States v. Agurs, 427 U.S. 97, 108, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976))). See also Ramseur v. Beyer, 983 F.2d 1215, 1239 (3d Cir.1992) (our review of a prosecutor's conduct in a state trial in a federal habeas proceeding is limited to determining whether the prosecutor's conduct "'so infect[ed] the trial with unfairness as to make the resulting conviction a denial of due process.'" (quoting Greer, 483 U.S. at 765, 107 S.Ct. 3102)). This determination will, at times, require us to draw a fine line-distinguishing between ordinary trial error on one hand, and "'that sort of egregious misconduct which amounts to a denial of constitutional due process'" on the other hand. Ramseur, 983 F.2d at 1239 (quoting United States ex rel. Perry v. Mulligan, 544 F.2d 674, 678 (3d Cir. 1976)).
>
> In evaluating whether the remarks of the prosecutor rise to the level of a constitutional violation, we are required to examine those remarks in the context of the whole trial. Ramseur, 983 F.2d at 1239 (citing Greer, 483 U.S. at 766, 107

S.Ct. 3102). The remarks must be sufficiently prejudicial in the context of the
entire trial to violate a petitioner's due process rights. Greer, 483 U.S. at 766, 107
S.Ct. 3102 (citing Donnelly v. DeChristoforo, 416 U.S. at 639, 94 S.Ct. 1868).

Werts, 228 F.3d at 197-98.

I cannot say that the complained-of comments made by the prosecutor during closing argument, even considered together, were sufficiently prejudicial in the context of the entire trial to violate Steele's due process rights. Most of the statements about which Steele complains were direct and appropriate responses by the prosecutor to statements made by Tershel during the defense closing argument. The rest were within the boundaries of permissible argument that a prosecutor may make to a jury at the conclusion of a trial. See PCRA Court Op., at 28-31.[22]

Steele asserts that the prosecutor made improper appeals to racial prejudice. This contention is unsupportable. When the prosecutor made the comments about which Steele complains, Trial Tr. at 1445-47, it was when he was discussing defense expert Dr. Bernstein's testimony regarding the fallibility of cross-racial identification. When considered in context, the prosecutor's comments were an acceptable response to the defense argument that the white witnesses may have had difficulty identifying Steele because of his race.

Steele also argues that the prosecutor improperly vouched for the Commonwealth's witnesses, attacked the credibility of the defense's witnesses, and offered personal opinions about the case. The Third Circuit Court of Appeals has instructed that in order to find improper vouching, two criteria must be met: (1) the prosecution must assure the jury that the testimony of a Government witness is credible, and (2) this assurance must be based on either the prosecutor's

_____

[22]     Although the PCRA Court's holding with respect to this claim is not entitled to deference under AEDPA because the Pennsylvania Supreme Court subsequently determined that this claim was waived, the PCRA Court provided a thorough analysis of this claim and, under my *de novo* review, I agree with its conclusion.

personal knowledge or other information that is not before the jury. Lam v. Kelchner, 304 F.3d 256, 271 (3d Cir. 2002). None of the comments by the prosecutor about which Steele complains satisfies this criteria. Additionally, "[o]n habeas review … prosecutorial misconduct such as vouching does not rise to the level of a federal due process violation unless it affects fundamental fairness of the trial. Thus, habeas relief is not available simply because the prosecutor's remarks were undesirable or even universally condemned. The relevant question for a habeas court is whether those remarks 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Id. (quoting Darden v. Wainwright, 477 U.S. 168, 180-81 (1986); Donnelly, 416 U.S. at 643). I cannot conclude that any of the prosecutor's comments regarding the credibility of any witnesses (defense or prosecution), or his personal opinions about the quality of the police investigation in this case, infected Steele's trial with "unfairness as to make the resulting conviction a denial of due process." Id.

Moreover, because Steele has not shown that the prosecutor committed misconduct during closing argument, he has not shown that Tershel and Liekar were objectively unreasonable in the manner in which they responded to the prosecutor's argument, or that he was prejudiced.

For these reasons, all of the claims in which Steele challenges the prosecutor's conduct during closing argument, and his counsel's alleged ineffectiveness in response thereto, are denied.


### E.    Juror Bias (Claim 13)

Steele asserts that he was denied due process and an impartial jury because the jury's deliberations were infected by the racial prejudice of one of the jurors, predisposed opinions

regarding his guilt, and deliberative discussions that were held prior to formal deliberation. In support, he relies upon the declaration of Danny Mellow, who served as a juror in his case. Mellow stated in his declaration that one of the jurors expressed racial bias, that the jury talked about the case and the parties prior to deliberations, and that racial prejudiced tainted the proceedings. Ex. 20 to Petitioner's Exhibits and Affidavits, submitted to the PCRA Court on Jan. 24, 2001.

Steele raised this claim in the PCRA proceeding and the Pennsylvania Supreme Court denied it on the merits. Steele II, 961 A.2d 807-08. As a result, I have the authority to issue the writ of habeas corpus only if its adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

In denying this claim, the Pennsylvania Supreme Court held that Mellow was incompetent to testify in the PCRA proceeding regarding any internal discussions or deliberations of the jury based upon the well-established evidence rule that generally bars juror testimony for the purpose of impeaching a verdict. This "no impeachment" rule is codified at Rule 606(b) of the Pennsylvania Rule of Evidence:

> Upon an inquiry into the validity of a verdict, ... a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions in reaching a decision upon the verdict or concerning the juror's mental processes in connection therewith, and a juror's affidavit or evidence of any statement by the juror about any of these subjects may not be received. However, a juror may testify concerning whether prejudicial facts not of record, and beyond common knowledge and experience, were improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.

Pa.R.E. 606(b).

I may not re-examine the Pennsylvania Supreme Court's determination that Mellow's testimony was inadmissible to support this claim. 28 U.S.C. § 2254(a); see, e.g., Estelle, 502 U.S. at 67-68; Real, 600 F.3d at 309. For that reason alone, this claim fails.

Steele insists that his Sixth Amendment right to an impartial jury trumps the state court's evidentiary ruling. In support, he relies upon a decision by the U.S. Court of Appeals for the Ninth Circuit, United States v. Henley, 238 F.3d 1111 (9th Cir. 2001), and other lower federal court cases which have suggested that the "no impeachment" rule is inapplicable where racial bias is alleged. None of the cases cited by Steele represent "clearly established Federal law, *as determined by the Supreme Court of the United States*[.]" 28 U.S.C. § 2254(d) (emphasis added). Moreover, Steele's argument is foreclosed by the Third Circuit Court of Appeals' decision in Williams v. Price, 343 F.3d 223 (3d Cir. 2003). In that case, the court expressly rejected Henley and held that the Pennsylvania Supreme Court did not violate "clearly established Federal law, as determined by the Supreme Court" in refusing to consider a juror's statements under Rule 606(b)'s "no impeachment" rule. Williams, 343 F.3d at 235-39. Accordingly, there is no merit to this claim and it is denied.


**F.**     **"Catchall" Claims (Claims 14 and 15)**

Finally, I briefly turn to Steele's "catchall" claims of error. He first argues that Tershel and Liekar were ineffective for failing to raise all of the claims of trial court and prosecutorial error at issue here. I reject this argument because I did not conclude that any of Steele's claims of trial court error or prosecutorial misconduct were procedurally defaulted due to Tershel and

Liekar's failure to raise them before the state court at trial or on direct review. Also, Steele has not shown that any of the claims of error or misconduct have merit. Therefore, he has not satisfied the requirements of Strickland.

Steele also argues that, even if none of his ineffective assistance or due process claims individually are sufficiently prejudicial to require relief, the cumulative prejudice incurred entitles him to relief. The Pennsylvania Supreme Court reject this claim on the merits, Steele II, 961 A.2d at 833-34, and its decision passes review under AEDPA's deferential standard of review.

Additionally, a cumulative effect claim is out of place here, because Steele has not demonstrated that there were multiple errors on the part of Tershel and Liekar, the trial court, or the prosecution. In Berryman v. Morton, 100 F.3d 1089, 1097-1102 (3d Cir. 1996), the Third Circuit Court of Appeals found that, as to each error alleged by petitioner, counsel had been deficient under Strickland, and therefore considered the cumulative effect of these errors for purposes of deciding whether prejudice had been shown. In this case, with regard to Steele's guilt phase, the only instance in which Steele has arguably shown that counsel may have performed deficiently is his claim that counsel should have retained a defense expert in hair comparison analysis, and gathered support from available scientific literature, in order to keep out Agent Podolak's testimony, or at least be able to rebut his testimony adequately during cross-examination. Steele has failed to demonstrate that he was prejudiced by his counsel's alleged failures in this regard, and there are no other errors on the part of counsel to aggregate.

For all of these reasons, Steele is not entitled to habeas relief on his "catchall" claims of error.

### G.    Certificate of Appealability

AEDPA codified standards governing the issuance of a certificate of appealability for appellate review of a district court's disposition of a habeas petition.  28 U.S.C. § 2253 provides that "[a] certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right."  Where the district court has rejected a constitutional claim on its merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).  Applying that standard here, jurists of reason would not find it debatable whether any of Steele's guilt-phase claims should be denied.  Accordingly, a certificate of appealability is denied.

## V.    Sentencing-Phase Claim

### A.    Jury Instruction on Mitigating Evidence (Claim 10)

#### (1)    Introduction

Steele alleges that his Eighth Amendment rights were violated when the trial court provided instructions suggesting that the jury had to unanimously find any mitigating evidence. The Pennsylvania Supreme Court held that this claim was waived because it was not raised at trial or on direct appeal.  Steele II, 961 A.2d at 831 (citing Commonwealth v. Cox, 863 A.2d 536, 554 (Pa. 2004) (petitioner did not properly preserve Mills claim at trial or on direct appeal and therefore it was waived pursuant to 42 Pa.C.S. § 9544(b)).  Steele contends that the "waiver" rule applied by the Pennsylvania Supreme Court is not an adequate bar to federal habeas review of this claim because the "relaxed waiver" that the Pennsylvania Supreme Court utilized in capital cases was in effect at the time he allegedly waived it.  See, e.g., Bronshtein v. Horn, 404

F.3d 700, 708-10 (3d Cir. 2005) (explaining Pennsylvania's "relaxed waiver" rule); Lark v. Sec'y Pennsylvania Dep't of Corr., 645 F.3d 596, 611-14 (3d Cir. 2011); Jacobs, 395 F.3d at 116-18. Cf. Abu-Jamal v. Horn, 520 F.3d 272, 299 n.27 (3d Cir. 2008) (noting ambiguity as to whether the Pennsylvania Supreme Court had held that Abu-Jamal waived the substantive Mills claim, but observing that: "[T]he Pennsylvania Supreme Court applied a relaxed waiver to all issues arising in a death penalty case. Since a strict waiver rule was not firmly established and regularly followed, state procedural grounds are not an adequate basis to support the judgment and cannot be ground for a procedural default."), *vacated on other grounds*, Beard v. Abu-Jamal, 130 S.Ct. 1134 (2010), and relief on Mills claim subsequently granted in Abu-Jamal v. Sec'y Pennsylvania Dep't of Corr., 643 F.3d 370 (3d Cir. 2011). The Commonwealth does not dispute Steele's argument in this regard and does not argue that this claim is procedurally defaulted.

Because the Pennsylvania Supreme Court did not address this claim on the merits, my review is *de novo*.


### (2)    Background

At the time of Steele's trial, Pennsylvania law provided for the death penalty for a defendant convicted of first degree murder if certain requirements were met. 42 Pa.C.S. § 9711. First, at a separate sentencing hearing following the guilt-phase of the trial, the Commonwealth had the burden of proving beyond a reasonable doubt that at least one statutorily-defined aggravating factor accompanied the murder. Id. § 9711(c)(1)(iii). Second, at this hearing, the defendant could introduce, and the jury could consider, mitigating evidence. Id. § 9711(c)(1)(ii). Third, after all the evidence was in, the jury could impose the death penalty only if jurors found that the statutorily-defined aggravating circumstances proven by the government outweighed any

57

mitigating circumstances presented by the defendant.  Id. § 9711(c)(1)(iv).  Finally, in cases where jurors found the existence of one or more aggravating circumstances but no mitigating circumstances, the death penalty was mandatory.  Id.; see also Blystone v. Pennsylvania, 494 U.S. 299, 301 (1990).

After the jury convicted Steele on three counts of first-degree murder, his trial proceeded to the penalty stage.  The Commonwealth did not present any new evidence at the sentencing hearing.  It relied upon the testimony and evidence presented in its case-in-chief to support its position that jurors should find the following aggravating circumstances:  (1) that Steele committed the killings while in the perpetration of a felony; (2) that the killings were committed by means of torture; and (3) (as applicable to two of the three victims) that Steele has been convicted of another murder committed at the time of the offense at issue.  42 Pa.C.S. § 9711(d)(6), (8), (10).  See also Trial Tr. at 1553-54.

In support of a life sentence, Tershel presented evidence that Steele had committed an act of heroism when he was younger, which qualifies as a mitigating circumstance under 42 Pa.C.S. § 9711(e)(8) (mitigating circumstances include "[a]ny other evidence of mitigation concerning the character and record of the defendant[.]").  Lamont Stevens testified that when he was three-years-old, he was walking to the store with his sister when his foot got stuck in the beam of the railroad tracks.  Several people observed the incident, but Steele is the only one who assisted him.  Stevens testified that Steele "ran from the hill out of nowhere" and freed him from the track in time to avoid being hit by an approaching train.  He said that Steele saved his life.  Trial Tr. at 1554-57.  The Carnegie Hero Award Commission awarded Steele with a medal for this act of heroism.  Id. at 1559, 1575.

To support additional mitigating circumstances under § 9711(e)(8), Steele presented the testimony of his mother.  Id. at 1558-59, 1575.  She stated that Steele loved his family.  She also stated that he always took care of people, sometimes to his own detriment.  She acknowledged that, as Steele had informed the jury himself when he had testified, he had been in jail before, but she said that his previous criminal record involved only non-violent offenses.  She stated that she had never known him to be a violent person.  Id. at 1558-59.

At the close of the sentencing hearing, the trial court gave the jury the instructions that are at issue today, which are discussed in detail below.  The court then explained that to the jury that it could consider as mitigating evidence Steele's "act of heroism … when he was approximately 17 or 18 years of age and he saved the life of … Lamont Stevens."  The court further instructed that the jury could "take into consideration Mr. Steele's mother's testimony concerning the defendant's background."  Finally, the court instructed that the jury could also consider "any and all other facts and circumstances of mitigating nature that you may find in this entire case."  Id. at 1575.

At the conclusion of its instruction, the court reviewed the one-page verdict form with the jury, and then it retired to deliberate.  Id. at 1577-79.  When it returned with its verdict, it submitted the completed one-page verdict forms for each murder conviction.  Each form read:

1.    We the jury unanimously sentence the defendant to

   __X__   death

   _____   life imprisonment

2.    (To be used if the sentence is death)

   We the jury have found unanimously



_____ at least one aggravating circumstance and no mitigating circumstance. The aggravating circumstance(s) is (are)

_____

_____

___X___ one or more aggravating circumstances which outweigh any mitigating circumstances. The aggravating circumstance(s) (is)(are)

_____

torture, multiple homicides, homicide during course of a felony[23]

[Pet's Ex. 26, ECF No. 41-1 at 141-43]. The jury did not identify the mitigating circumstances found. Neither the court nor the verdict form directed it to do so. Each verdict sheet was signed by the foreman.

### (3) Legal Analysis

The U.S. Supreme Court recently explained:

The rule the Court set forth in <u>Mills</u> is based on two well-established principles. First, the Constitution forbids imposition of the death penalty if the sentencing judge or jury is "'precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'" <u>Mills</u>, 486 U.S. at 374 (quoting <u>Eddings v. Oklahoma</u>, 455 U.S. 104, 110 (1982), in turn quoting <u>Lockett v. Ohio</u>, 438 U.S. 586, 604 (1978) (plurality opinion)). Second, the sentencing judge or jury "'may not refuse to consider or be precluded from considering 'any relevant mitigating evidence.'"' <u>Mills</u>, 486 U.S. at 374-375 (quoting <u>Skipper v. South Carolina</u>, 476 U.S. 1, 4 (1986), in turn quoting <u>Eddings</u>, *supra*, at 114).

Applying these principles, the Court held that the jury instructions and verdict forms at issue in the case violated the Constitution because, read naturally, they told the jury that it could not find a particular circumstance to be mitigating unless all 12 jurors agreed that the mitigating circumstance had been proved to exist. <u>Mills</u>, 486 U.S., at 380-381. If, for example, the defense presents evidence of three potentially mitigating considerations, some jurors may believe that only the

---

[23]    In the murder of Sarah Kuntz, the jury found two aggravating circumstances (torture and multiple homicides).

first is mitigating, some only the second, and some only the third. But if even one of the jurors believes that one of the three mitigating considerations exists, but that he is barred from considering it because the other jurors disagree, the Court held, the Constitution forbids imposition of the death penalty. See id., at 380, 384; see also McKoy v. North Carolina, 494 U.S. 433, 442-443 (1990) ("Mills requires that each juror be permitted to consider and give effect to ... all mitigating evidence in deciding ... whether aggravating circumstances outweigh mitigating circumstances ..."). Because the instructions in Mills would have led a reasonable juror to believe the contrary, the Court held that the sentencing proceeding violated the Constitution. 486 U.S., at 374-375, 108 S.Ct. 1860.

Smith v. Spisak, 558 U.S. — , 130 S.Ct. 676, 681-82 (2010) (parallel citations omitted).

The Third Circuit Court of Appeals has held that the legal standard for reviewing a Mills claim is whether "there was 'a substantial probability that reasonable jurors, upon receiving the judge's instructions in this case, and in attempting to complete the verdict form as instructed, well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance.'" Abu-Jamal, 643 F.3d at 374 (quoting Mills, 486 U.S. at 384). It has considered on a number of occasions the rule in Mills against the standard sentencing-phase jury instructions and verdict form that were used in Steele's case and in other Pennsylvania capital cases held in and around the 1980s. Id. (holding that the same instructions given in Steele's case violated Mills, and that the Commonwealth had to conduct a new sentencing hearing or resentence the petitioner to life imprisonment), cert. denied sub nom., — S.Ct. — , 2011 WL 3053650 (Oct. 11, 2011); Albrecht, 485 F.3d at 119-20 (finding a Mills violation, but vacating the district court's order granting habeas relief because, unlike in this case, Mills could not be applied retroactively to the petitioner's case under Teague v. Lane, 489 U.S. 288 (1989))[24]; Hackett v. Price, 381 F.3d 281, 301-03 (3d Cir. 2004) (applying

---

[24]  Under the retroactivity analysis as set forth in Teague, federal habeas corpus petitioners may not avail themselves of new rules of criminal procedure outside two narrow exceptions not applicable here. In Beard v. Banks, 542 U.S. 406 (2004), the U.S. Supreme Court held that Mills

AEDPA's standard of review and denying habeas relief under <u>Mills</u> where, unlike in Steele's case, the jury found unanimously that there were no mitigating circumstances); <u>Banks v. Horn,</u> 271 F.3d 527, 547-48 (3d Cir. 2001) (granting a writ of habeas corpus because the jury instruction and verdict form, which were very similar to those given in Steele's case, caused <u>Mills</u> error), *rev'd* <u>Beard v. Banks,</u> 542 U.S. 406 (2004) (vacating the Third Circuit Court of Appeals' order granting habeas relief because, unlike in this case, <u>Mills</u> could not be applied retroactively to the petitioner under <u>Teague</u>); <u>Frey v. Fulcomer,</u> 132 F.3d 916 (3d Cir. 1997) (granting habeas relief under <u>Mills</u>). But <u>see</u> <u>Zettlemoyer v. Fulcomer,</u> 923 F.2d 284 (3d Cir. 1991) (no <u>Mills</u> error where the instructions had a seventeen word separation between the unanimity clause and the mitigating circumstances clause), *called into question by* <u>Abu-Jamal,</u> 520 F.3d at 304 ("<u>Zettlemoyer</u> is in tension with <u>Frey</u> and we will not engage in a sentence-level parsing of the language employed. Our analysis relies on the United State Supreme Court precedent in finding a <u>Mills</u> violation).

Abu-Jamal and <u>Frey</u> are on point and are precedential authority. In both cases, the trial court gave instructions that are the same in all relevant respects to those that were given in Steele's case, as the following side-by-side comparison shows:

---

announced a new rule of criminal procedure. Therefore, under <u>Teague,</u> <u>Mills</u> cannot be applied to a federal habeas petitioner's case if his judgment of sentence became final *before* <u>Mills</u> was decided on June 6, 1988. <u>Banks,</u> 542 U.S. at 420.

Steele's judgment of sentence became final in 1989. <u>See, e.g.,</u> <u>Banks,</u> 542 U.S. at 411-13 ("State convictions are final for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied." (internal citation and quotations omitted). As a result, as Steele explains, his case does not present a potential non-retroactivity problem. [ECF No. 22, Memorandum Of Law In Support Of Petition, at 142]. The Commonwealth does not contest this point. Moreover, it does not raise any argument under <u>Teague</u> regarding the application of any post-<u>Mills</u> case.

| Steele Instruction | Abu-Jamal Instruction | Frey Instruction |
|---|---|---|
| Members of the jury, you must now decide whether the defendant, Roland Steele, is to be sentenced to death or life imprisonment. | Members of the jury, you must now decide whether the defendant is to be sentenced to death or life imprisonment. | |
| The sentence will depend upon your findings concerning aggravating and mitigating circumstances. | The sentence will depend upon your findings concerning aggravating and mitigating circumstances. | The sentence will depend upon your findings concerning aggravating and mitigating circumstances. |
| The Pennsylvania Crimes Code provides that the verdict must be a sentence of death of the jury unanimously finds at least one aggravating circumstance and no mitigating circumstances, or it the jury unanimously finds one or more aggravating circumstance which outweighs any mitigating circumstances. | The Crimes Code provides that a verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance and no mitigating circumstance, or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances. | The Crimes Code provides that the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance and no mitigating circumstance, or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances. |
| The verdict must be a sentence of life imprisonment in all other cases. | The verdict must be a sentence of life imprisonment in all other cases. | The verdict must be a sentence of life imprisonment in all other cases. |
| * * * | * * * | * * * |
| The Commonwealth has the burden of proving aggravating circumstances beyond a reasonable doubt, as I defined that term to you yesterday. The defendant has the burden of proving mitigating circumstances but only by a preponderance of the evidence. This is a lesser burden of proof than beyond a reasonable doubt. A preponderance of the evidence is this where one side is more | The [C]ommonwealth has the burden of proving aggravating circumstances beyond a reasonable doubt. The defendant has the burden of proving mitigating circumstances, but only by a preponderance of the evidence. This is a lesser burden of proof than beyond a reasonable doubt. A preponderance of the evidence exists where one side is more believable than the other side. | Now, the Commonwealth has the burden of proving aggravating circumstances beyond a reasonable doubt.... The defendant has the burden of proving mitigating circumstances but only by a preponderance of the evidence. This is a lesser burden of proof than beyond a reasonable doubt.... |

| | | |
|---|---|---|
| believable than the other. | | |
| All the evidence from all sides, including the evidence you heard during the trial-case-in-chief, as to aggravating or mitigating circumstances is important and proper for you to consider. | All the evidence from both sides, including the evidence you heard earlier during the trial-in-chief as to aggravating or mitigating circumstances is important and proper for you to consider. | All the evidence from both sides, including the evidence you heard earlier during the trial in chief, as to aggravating or mitigating circumstances, is important and appropriate for you to consider. |
| * * *<br><br>Now, the verdict is for you, members of the jury. | * * *<br><br>Now, the verdict is for you, members of the jury. | * * * |
| Remember and consider all the evidence, giving it the weight to which it is entitled. Remember that you are not merely recommending punishment. The verdict you return today will actually fix the punishment at death or life imprisonment. | Remember and consider all of the evidence giving it the weight to which it is entitled. Remember that you are not merely recommending a punishment. The verdict you return will actually fix the punishment at death or life imprisonment. | |
| Remember again, that your verdict must be unanimous. It cannot be reached by a majority vote of by any percentage. It must be the verdict of each and everyone [sic] of you. | Remember again that your verdict must be unanimous. It cannot be reached by a majority vote or by any percentage. It must be the verdict of each and everyone [sic] of you. | |
| Remember that your verdict must be a sentence of death, if you unanimously find at least one aggravating circumstances and no mitigating circumstance of if you unanimously find one or more aggravating circumstances which outweigh any mitigating circumstances. In all other cases your verdict must be a sentence of life imprisonment. | Remember that your verdict must be a sentence of death if you unanimously find at least one aggravating circumstance and no mitigating circumstances. Or, if you unanimously find one or more aggravating circumstances which outweigh any mitigating circumstances. In all other cases, your verdict must be a sentence of life imprisonment. | Remember that your verdict must be a sentence of death if you unanimously find at least one aggravating circumstance[] and no mitigating circumstances, or if you unanimously find one or more aggravating circumstances which outweigh any mitigating circumstances. In all other cases, your verdict must be a sentence of life imprisonment. |

| Trial Tr. at 1572-77. | Abu-Jamal, 643 F.3d at 376-77, 380 n.9; Abu-Jamal, 520 F.3d 272 at 301-02. | Frey, 132 F.3d at 922-93. |
|---|---|---|

In addition, in both Abu-Jamal and Frey, as in this case, the jury checked the box on the verdict form indicated that: "We have found unanimously … one or more aggravating circumstances which outweigh any mitigating circumstances." Abu-Jamal, 643 F.3d at 376; Commonwealth v. Frey, 554 A.2d 27, 31 n.2 (Pa. 1989).[25]

In Abu-Jamal and Frey, the Third Circuit Court of Appeals determined that there was a Mills violation and that the Commonwealth had to conduct a new sentencing hearing or, in the alternative, resentence the petitioner to a term of life imprisonment.[26] The court gave the following reasons to support its conclusion. First, the jury charge and verdict from repeated and emphasized unanimity:

> It is substantially probable the verdict form's first page, especially "[w]e, the jury, have found unanimously ... one or more aggravating circumstances which outweigh any mitigating circumstances," was read by the jury to mean that both aggravating and mitigating circumstances must be found unanimously. The jury

---

[25] The verdict form employed in Frey and in this case appear to have been the same. See Frey, 554 A.2d at 32 n.2. So too is the first page of the verdict form used in Abu-Jamal. However, in that case the verdict form also contained two subsequent pages in which the potential aggravating and mitigating circumstances were listed. Abu-Jamal, 643 F.3d at 379-80. The jury was instructed to mark an "X" indicated whichever mitigating circumstances it found. At his sentencing hearing, Abu-Jamal read a prepared statement to the jury in which he claimed he had been denied the right to be represented by counsel of his choice. He did not allow his counsel to call any mitigating witnesses. The trial court instructed the jury that it could consider all of the trial testimony in its deliberations to determine aggravating and mitigating circumstances. See Commonwealth v. Wesley Cook a/k/a Mumia Abu-Jamal, 1995 WL 1315980, *17 (C.P. Phila. Sept. 15, 1995). In completing the verdict form, the jury checked the box by the following mitigating circumstance: "[t]he defendant has no significant history of prior criminal convictions[.]" Abu-Jamal, 643 F.3d at 376 n.6. In Frey, as in this case, the jury did not list on the verdict form the mitigating circumstances it found.

[26] In fact, in Abu-Jamal, the Third Circuit Court of Appeals reached its conclusion under AEDPA's more deferential standard of review, which does not apply in this case.

65

instructions read similarly, stating: "The Crimes Code provides that a verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance and no mitigating circumstance, or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances." … Moreover, the instructions throughout and repeatedly emphasized unanimity. In light of the language and parallel structure of the form and instructions in relation to aggravating and mitigating circumstances, it is notable that neither the verdict form nor the judge's charge said or in any way suggested that the jury should apply the unanimity requirement to its findings of aggravating but not mitigating circumstances.

Abu-Jamal, 643 F.3d at 377; id. at 378 ("In the absence of any instruction or even suggestion to the contrary, it is substantially probable the jury applied the unanimity requirement to 'mitigating circumstances' as well."); Frey, 132 F.3d at 923 (the jury charge itself "emphasize[d] the importance of a unanimous finding, using the phrase frequently and in close proximity to – within seven words of – the mitigating circumstances clause." The phrase "if the jury unanimously finds at least one aggravating circumstance and no mitigating circumstance" was "one sound bite" which would have lingered in the minds and the ears of the jurors such that they would "believe that mitigating circumstances had to be found unanimously.").

Second, the trial court's instruction, which distinguished between mitigating and aggravating circumstances with respect to the proper standard of proof applicable to each, only served to "reinforce[ ] the apparent similitude with respect to the findings of mitigating and aggravating circumstance, increasing 'the risk that the jury was misinformed,' and impermissibly limited in its consideration of mitigating evidence." Abu-Jamal, 643 F.3d at 380 (citing Mills, 486 U.S. at 381) (footnote omitted). As noted in Frey, in instructing on the burden of proof, the trial court "did not stress that the different burdens that attach to aggravating and mitigating circumstances also entail different unanimity requirements." 132 F.3d at 924. Accordingly, "[a] lay jury might plausibly conclude … that aggravating *and* mitigating circumstances must be

66

discussed and unanimously agreed to, as is typically the case when considering whether a burden of proof has been met." Id. Such an understanding, however, "is plainly inconsistent with the requirements of Mills[.]" Id.; Abu-Jamal, 643 F.3d at 377, 380.

Finally, changes in Pennsylvania's standard jury instructions and verdict form made after Mills was decided "highlight the ambiguity at issue in this case and on their own serve at least to suggest the substantial probability that 'some jurors were prevented from considering 'factors which may call for a less severe penalty.'"" Abu-Jamal, 643 F.3d at 383 (quoting Mills, 486 U.S. at 376, which in turn quoted Lockett, 438 U.S. at 605). The standard verdict form was changed in a way that made clear to the jury that it need not be unanimous with respect to mitigating circumstances. Id. at 382 (setting forth the revised verdict form, which is at Pa.R.Crim.P. 358A (1989) (referring to the "mitigating circumstance(s) found by one or more of us (is) (are).")). The Pennsylvania Standard Criminal Jury Instruction now recommends the instruction which follows:

> When voting on general findings, you are to regard a particular aggravating circumstance as present only if you all agree that it is present. On the other hand, each of you is free to regard a particular *mitigating* circumstance as present despite what other jurors may believe. This is different from the general findings to reach your ultimate sentence of either life in prison or death. The specific findings as to any particular aggravating circumstance must be unanimous. All of you must agree that the Commonwealth has proven it beyond a reasonable doubt. That is not true for any mitigating circumstance. Any circumstance that any juror considers to be mitigating may be considered by that juror in determining the proper sentence.

Id. at 383 (quoting Pa. Suggested Standard Criminal Jury Instructions § 15.2502H(3) (2006)). While these "well-meant efforts to remove ambiguity from the State's capital sentencing scheme" did not prove Frey's and Abu-Jamal's Mills claim, it could be inferred from such changes "at least some concern" on the part of the state "that juries could misunderstand the previous

instructions as to unanimity and the consideration of mitigating evidence by individual jurors."

Frey, 132 F.3d at 924 (quoting Mills, 486 U.S. at 382); Abu-Jamal, 643 F.3d at 382-83.

Additionally, in this case, as in Abu-Jamal and Frey, the trial court repeatedly used the word "you" throughout the instructions to refer to the unanimous jury as an entity. The instructions set forth above demonstrate that point. So too do the following portion of the court's charge, which specifically discuss mitigating circumstances and which emphasized that the jury's *finding*s as to mitigating circumstances had to be made by "you," and never indicating to the jurors that they did not have to unanimously agree on their findings with respect to mitigating circumstances:

> For the purpose of this case, the following matters, if proven be a preponderance of the evidence, can constitute mitigating evidence: the defendant's act of heroism … when he was approximately 17 or 18 years of age and he saved the life of a Lamont Stevens… Also *you* may take into consideration Mr. Steele's mother's testimony concerning the defendant's background and as *you* heard her testify, plus any and all other facts and circumstances of mitigating nature that *you* may find in this entire case.
>
> * * *
>
> "Now, *you* will be given a verdict slip on which to record *your verdict and findings* and I will go over that with you but you will note that in paragraph two of the verdict slip, it requires *you to make a special finding of aggravating and mitigating circumstances* if your verdict is death. If, after conscientious and thorough deliberations, *you are unable to agree on your findings and verdict* you should report that to me.

Trial Tr. at 1575, 1577.

There can be no doubt that the decisions in Abu-Jamal and Frey required that I conclude that the instruction and verdict form employed in Steele's case violated the Eighth Amendment. When placed side-by-side, the instructions given in this case and those cases are the same in all relevant respects. They all contain the same ambiguous unanimity language, the same

troublesome language on burden of proof, and fail to mention that the different burdens of proof

for aggravating and mitigating circumstances also contain different unanimity requirements.

The Commonwealth does not cite a single case in its response to this claim, even though

the constitutionality of the same instructions and verdict form used in this case has been

thoroughly addressed on numerous occasions by the Third Circuit Court of Appeals.  Its only

argument is that there is no factual support for this claim [see ECF No. 25 at 14], which is

plainly wrong.

Thus, for all of the aforesaid reasons, I am constrained to grant relief on this claim and

direct that the Commonwealth either conduct a new capital sentencing hearing or resentence

Steele to life imprisonment without the possibility of parole.


BY THE COURT:


Date: November 16, 2011                    s/Arthur J. Schwab
                                           Arthur J. Schwab
                                           United States District Judge


cc: All counsel of record